J36VJAR1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                            18 CR 475 (PAC)

ROLAND JARVIS,

            Defendant.          SUPPRESSION HEARING

------------------------------x

                                  New York, N.Y.
                                  March 6, 2019
                                  9:47 a.m.

Before:

                 HON. PAUL A. CROTTY,

                               District Judge

                     APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
DANIEL G. NESSIM
EUN YOUNG CHOI
    Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK INC.
    Attorneys for Defendant
IAN H. MARCUS AMELKIN
SABRINA SHROFF
LAUREN DOLECKI

ALSO PRESENT:  CAROLINE LEFEVER, Paralegal-USAO
                CANDICE HENRY, ATF
                CHIRAAYU GOSRANI, Paralegal-FDNY

J36VJAR1

1              (Case called)

2              THE DEPUTY CLERK:  Counsel for the government, please

3     state your appearance.

4              MR. NESSIM:  Good morning, your Honor.

5              Daniel Nessim and Eun Young Choi, for the government.

6              THE COURT:  Ms. Choi.

7              MR. NESSIM:  Joining us at counsel table is our

8     paralegal in our office, Caroline Lefever, and Special Agent

9     Candice Henry, with the Bureau of Alcohol, Tobacco, Firearms

10    and Explosives.

11             THE COURT:  Ms. Henry, how are you?

12             MS. HENRY:  Good morning.

13             MR. MARCUS AMELKIN:  Good morning, your Honor.

14             Ian Marcus Amelkin of the Federal Defenders of New

15    York.

16             Joining me at counsel's table is Ms. Sabrina Shroff,

17    another attorney in our office; Roland Jarvis, who, of course,

18    is our client; Lauren Dolecki, who is a secondi in our office

19    from Debevoise & Plimpton; and at the end of the table is

20    Chiraayu Gosrani, who is a paralegal in our office.

21             THE COURT:  All right, Mr. Amelkin.

22             How are you this morning, Mr. Jarvis?

23             THE DEFENDANT:  I'm all right.

24             THE COURT:  Do you want to call your first witness,

25    Mr. Nessim, Mr. Choi?

J36VJAR1

1            MR. NESSIM:  Yes, your Honor.

2            The government calls Officer Anthony Cassase.

3            (Continued on next page)

J365jar2                          Cassase – direct

1             THE DEPUTY CLERK:  Please state and spell your full

2    name for the record.

3             THE WITNESS:  Anthony Cassase.

4     ANTHONY CASSASE,

5          called as a witness by the Government,

6          having been duly sworn, testified as follows:

7             THE COURT:  All right, Mr. Nessim.

8    DIRECT EXAMINATION

9    BY MR. NESSIM:

10   Q.  Good morning, Officer Cassase.

11   A.  Good morning.

12   Q.  Where do you work?

13   A.  Manhattan North Narcotics.

14   Q.  What is Manhattan North Narcotics?

15   A.  We investigate narcotics cases.

16   Q.  Do you work for the New York City Police Department?

17   A.  Yes.

18   Q.  Have you always worked in Manhattan North Narcotics?

19   A.  No.

20   Q.  How long have you been with the NYPD?

21   A.  Little over six and a half years.

22   Q.  Where did you work before you were in Manhattan North

23   Narcotics?

24   A.  I was in Bronx Borough crime.

25   Q.  Roughly what period were you in Bronx Borough crime?

J365jar2                         Cassase – direct

1   A.   Approximately August to November.

2   Q.   Of which year?

3   A.   Of 2018.

4   Q.   Where were you before Bronx Borough crime?

5   A.   I was in the anti-crime team in the 44 Precinct in the

6   Bronx.

7   Q.   Where in the Bronx is the 44 Precinct located?

8   A.   That's south Bronx.

9   Q.   What unit were you assigned to in May of 2018?

10  A.   44 Precinct anti-crime.

11  Q.   And, what are your duties and -- what were your duties and

12  responsibilities as an anti-crime officer?

13  A.   We handled violent crimes, mainly robberies, guns,

14  burglaries.  We also deal with the local gangs in the area.

15  Q.   Have you had experience in investigating and detecting

16  violent crime?

17  A.   Yes.

18  Q.   And gun crimes?

19  A.   Yes.

20  Q.   Approximately how many times have you been involved in

21  firearms arrests?

22  A.   I have several myself and I have been involved in probably

23  20, 30 other ones.

24  Q.   Directing your attention to the evening of May 3rd into the

25  morning of May 4th, 2018 --

J365jar2                              Cassase - direct

1    A.   Yes.

2    Q.   -- what were you doing that night?

3    A.   I was patrolling the 44 Precinct as an anti-crime officer.

4    Q.   And what shift were you working on that night?

5    A.   I started at 9:30 at night and finished at 6:05 in the

6    morning the next day.

7    Q.   What day is that shift considered under NYPD policy?

8    A.   Excuse me?

9    Q.   What day would you consider that shift having taken place

10   on?

11   A.   That would be the 4th.

12   Q.   But it began on the 3rd?

13   A.   It began on the 3rd and goes into the 4th but it is

14   considered the 4th.

15   Q.   Were you working with other officers that night?

16   A.   Yes.

17   Q.   Who were you working with?

18   A.   Officer Maria, Officer Cabrera, and Sergeant Crane.

19   Q.   What were you wearing?

20   A.   Plain clothes.

21   Q.   What were the other officers wearing?

22   A.   We were all in plain clothes.

23   Q.   And, how were you traveling that night?

24   A.   In an unmarked vehicle.

25   Q.   Where were you sitting in the vehicle?

J365jar2                              Cassase - direct

1    A.   I was in the back seat with Officer Maria, and Sergeant

2    Crain and Officer Cabrera were in the front seat.

3    Q.   Directing your attention to approximately 1:00 a.m. on May

4    4th, where were you at that time?

5    A.   The vicinity of 166 and Woodycrest.

6    Q.   And what, if anything, did you observe at that time and

7    place?

8    A.   We observed a group of people on the northeast corner,

9    little bit off the northeast corner and they were -- it looked

10   like they were drinking, there was cups everywhere and I could

11   smell marijuana coming from the location.

12   Q.   How were you able to smell marijuana?

13   A.   My window was down, I could smell it.

14   Q.   And you mentioned the northeast corner, what was the

15   intersection?

16   A.   It is west 166 Street and Woodycrest Avenue.

17   Q.   So, Ms. Lafever, if you could pull up what is marked for

18   identification Government Exhibit 1?

19            Officer Cassase, do you recognize this?

20   A.   Yes.

21   Q.   What is it?

22   A.   This is the area where the arrest took place to the 44th

23   Precinct.

24   Q.   And, is the intersection we just described, is that on this

25   map?

J365jar2                          Cassase - direct

1   A.  Yes.

2   Q.  Is this map a fair and accurate representation of this

3   neighborhood of the Bronx?

4   A.  Yes.

5           MR. NESSIM:  Your Honor, the government offers

6   Government Exhibit 1.

7           MR. MARCUS-AMELKIN:  No objection.

8           THE COURT:  1 is in evidence.

9           (Government's Exhibit 1 received in evidence)

10  BY MR. NESSIM:

11  Q.  Officer Cassase, using this map, can you describe where

12  that intersection is located?

13  A.  Yes.  Can I touch the screen?

14  Q.  Sorry?

15  A.  How do you want me to do that?

16  Q.  If you can use maybe, there are labels on the map to help

17  you identify locations or street names?

18  A.  Oh.  West 166th Street and Woodycrest.

19  Q.  Is that the where the red circle is being drawn now?

20  A.  Yes.

21  Q.  Is that the corner that you observed this group of people?

22  A.  Yes.

23  Q.  What, if anything, did you know about this neighborhood of

24  the Bronx at this time?

25  A.  There was a lot of violence, gang activity.  We had several

J365jar2                           Cassase - direct

1    shootings in that area.

2    Q.  And what, if anything about the gang activity that stands

3    out in your mind?

4    A.  We have -- we have a gang called Five Bridges, they're like

5    up in 165, approximately, 165, 167 University.  We have a crew

6    called Woody Crime, they're down by 165, like Nelson,

7    Woodycrest area.  There is also another Dominican crew down

8    about on Anderson and 165, 166 area.

9    Q.  So -- I'm sorry.

10   A.  No.  Go ahead.

11   Q.  So, the first gang you identified you said 165 to 167

12   University?

13   A.  Yes.

14   Q.  Using the labels on this map, can you direct our attention

15   to approximately where that area is located?

16   A.  It's --

17              MR. MARCUS-AMELKIN:  Objection.  Relevance.

18              THE COURT:  Overruled.  He is talking about precinct

19   conditions.

20   BY MR. NESSIM:

21   Q.  Do you see on the map the approximate area?

22   A.  Yes; West 165 Street and University in the bottom left

23   corner, yes, and then it goes up to about 167 Street and

24   University.

25   Q.  Is that a little bit cut off?

J365jar2                          Cassase – direct

1    A.  Yes.  It is about the same area.

2    Q.  And then the Woody Crime gang you mentioned?

3    A.  Yeah, they're down by 165, bottom center of the screen by

4    Nelson to, about, Woodycrest.

5    Q.  So, approximately where A&A Grocery and Deli is labeled on

6    the map?

7    A.  Yes.

8    Q.  And the third group that you identified?  Approximately

9    where?

10   A.  Down by Anderson on the right side.

11   Q.  Anderson and what cross street?

12   A.  166 to 167-ish, approximately.

13   Q.  So, around the block where it says 1150 Realty?

14   A.  Say that again?

15   Q.  Around where the label reads 1150 Realty?

16   A.  Yes.

17   Q.  Thank you.

18          Ms. Lafever, can we please pull up for identification

19   Government Exhibit 2?

20          Officer Cassase, do you recognize this?

21   A.  Yes.

22   Q.  What is it?

23   A.  This is where the arrest was made.

24   Q.  What intersection does this show?

25   A.  This is West 166 Street and Woodycrest Avenue.

J365jar2                          Cassase - direct

1    Q.  Is this a fair and accurate representation of that

2    intersection?

3    A.  Yes.

4            MR. NESSIM:  Your Honor, the government offers

5    Government Exhibit 2.

6            MR. MARCUS-AMELKIN:  No objection.

7            THE COURT:  2 is in evidence.

8            (Government's Exhibit 2 received in evidence)

9    BY MR. NESSIM:

10   Q.  Officer Cassase, using this exhibit, can you describe

11   approximately where the group of people you observed were

12   located?

13   A.  Right by these, this dark gray car in the front.

14   Q.  When you say the dark gray car, do you mean the third car?

15   A.  Yes.

16   Q.  Parked on the street?

17   A.  Yes.

18   Q.  Approximately how many people did you see?

19   A.  I would say about possibly eight to 10.

20   Q.  And, what did you mention you observed them doing?

21   A.  It appeared that they were drinking and I could smell

22   marijuana coming from the area.

23   Q.  What did you decide to do?

24   A.  We approached the group and when we approached them I

25   noticed the defendant start walking off.  That's what drew my

J365jar2                          Cassase – direct

1   attention to him initially.

2   Q.  You mentioned the defendant.  Do you recognize the

3   individual who attracted your attention in the courtroom today?

4   A.  Yes.

5   Q.  Could you identify him by where he is sitting and an

6   article of clothing he is wearing?

7   A.  Dark colored shirt in the center of the table.

8          MR. NESSIM:  Your Honor, we would like the record to

9   reflect that the witness has identified the defendant.

10         THE COURT:  Mr. Marcus Amelkin.

11         MR. MARCUS AMELKIN:  No objection.

12         THE COURT:  Okay.

13  BY MR. NESSIM:

14  Q.  Can you describe what took place as you approached the

15  group?

16  A.  Yes.  As soon as we rolled up, I saw the defendant start

17  walking off, he had like a nervous, like -- like seen-a-ghost

18  type face.  He started adjusting his waistband and started

19  walking south on Woodycrest.  He kept looking at me, I stepped

20  out of the vehicle.  I said: *Police.  Hold up.*  He kept

21  walking.  So, I walked south on Woodycrest in the street to try

22  to cut him off, I thought he was going to run.  As I approached

23  him from the street, he turned his body away from me and

24  started walking northbound again.  I told him again, I said,

25  *hold up*, again and he tried to run and he ran between two cars

J365jar2                          Cassase - direct

1    into the street and that's where I grabbed him.

2    Q.  How far would you say he got when you say he ran?

3    A.  A couple steps.

4    Q.  And, just to back up a little bit to break some of that

5    down, so you mentioned what drew your attention initially to

6    the defendant?

7    A.  He was the only one that I saw that started walking away

8    right away as soon as he came up.

9    Q.  And, which direction was he walking?

10   A.  He was walking south.

11   Q.  So, using this Government Exhibit 2 that's on your screen,

12   so which street is in the street with the cars parked in the

13   foreground of this picture?

14   A.  This is Woodycrest Avenue.

15   Q.  And the street running the other direction, the

16   intersection, that is which street?

17   A.  That's West 166th Street.

18   Q.  And so, when he walked southbound, which way was he

19   walking?

20   A.  Towards 166 Street.

21   Q.  Approximately where was it that you got out of your patrol

22   car?

23   A.  About the same, same place as the red circle, right in that

24   area.

25   Q.  And where did you walk?

J365jar2                          Cassase - direct

1    A.  I walked -- I was in the street.  I walked south in the

2    street.

3    Q.  What did you observe as were walking south?

4    A.  I observed him, he kept looking at me.  I wasn't really

5    paying attention to anything else to be honest with you but I

6    was watching him and just observed him, he kept looking at me

7    and he adjusted the waistband.  And when I started approaching

8    him he turned the opposite way, looked like he was trying to

9    hide whatever he had.

10   Q.  And you mentioned he is touching his waistband.  Can you

11   describe what you saw?

12   A.  Yes.  He held it and slid it to the right a little bit and

13   then he was just holding it.

14   Q.  What did that make you think when he touched his waistband?

15   A.  I believed that he had a gun.

16   Q.  Why do you believe that?

17   A.  Because I have been involved in -- I have been involved in

18   a bunch of other arrests I have seen that before.  I, myself,

19   carry a gun, so when I put it in front of my waistband I use

20   the same type of movements because you don't want to --

21   sometimes if it slides in you don't want it to fall, or if are

22   you going to run you want to slide it over a little bit because

23   it makes it more secure.

24   Q.  And, you mentioned you said something to the defendant?

25   A.  Yes.

J365jar2                        Cassase - direct

1   Q.   What did you tell him?

2   A.   I said:  *Police.  Hold up.*

3   Q.   How many times did you tell the defendant that?

4   A.   At least twice.

5   Q.   And when in the interaction did you say that?

6   A.   What's that?

7   Q.   At what point in this interaction did you tell the

8   defendant to hold up?

9   A.   When I got out of the car, initially, and then when I

10  approached him on the sidewalk.  And then he said:  *For what?*

11  And then took off running.

12  Q.   And let's talk about the running.  What did you do once you

13  saw the defendant run?

14  A.   I grabbed him by his hair and I tackled him.

15  Q.   And where did you tackle him?

16  A.   In the street.  He ran between the two cars and then I

17  tackled him in the street.

18  Q.   So, you landed on the pavement?

19  A.   Yes.

20  Q.   And, what did you do once the defendant was on the ground?

21  A.   He still had his hands underneath him.  He was face down so

22  he still had his hand underneath him and I was trying to pull

23  his arm off because I didn't -- it seemed like he still had his

24  hand on the gun.

25  Q.   And when you were trying to pull his arm up what was he

J365jar2                              Cassase – direct

1   doing with his arm?

2   A.   He was pulling back.

3   Q.   What do you mean by pulling back?

4   A.   He wasn't letting me pull his arm back.  He was like

5   resisting, pushing forward the opposite direction of me.

6   Q.   What happened next?

7   A.   My partners came over and then Officer Maria reached

8   underneath and took his hand off the gun and pulled the gun

9   out.

10  Q.   Officer Maria recovered the gun?

11  A.   Correct.

12  Q.   What happened after the gun was recovered?

13  A.   He was placed under arrest.

14  Q.   Approximately how long would you say it was between the

15  point where you got out of your patrol car and where you

16  tackled the defendant?

17  A.   15, 20 seconds.

18  Q.   And, approximately how long would you say it was between

19  the time where you tackled the defendant and the time where you

20  recovered the firearm?

21  A.   Probably 15 seconds.  10, 15 seconds.  I can't remember.

22          MR. NESSIM:  Your Honor, can we have one moment?

23          THE COURT:  Yes.

24          (Counsel conferring)

25          MR. NESSIM:  Your Honor, at this time the government

J365jar2                        Cassase – direct

1    offers into evidence Government Exhibits 3A, 4A, and 5A, which

2    are videos related to this incident, we understand, without

3    objection from defense counsel.

4             MR. MARCUS-AMELKIN:  That's correct.

5             THE COURT:  3A, 4A, and 5A are in evidence.

6             (Government's Exhibits 3A, 4A, and 5A received in

7    evidence)

8    BY MR. NESSIM:

9    Q.  Ms. Lafever, can we please pull up Government Exhibit 5A?

10            (Video played)

11   Q.  Officer Cassase, do you recognize this video?

12   A.  Yes.

13   Q.  What is it?

14   A.  This is a video of the incident that happened, the arrest.

15   Q.  Do you know approximately where this camera is located?

16   A.  It's on the building that was in the other picture.

17   Q.  We are going to rewind this video and just ask you some

18   questions about what is happening during the course of it.

19   A.  Sure.

20            THE COURT:  Officer, do I understand the camera was on

21   the building in Exhibit 2?

22            THE WITNESS:  Yes.

23   BY MR. NESSIM:

24   Q.  So, the street it is facing out into, what street is that?

25   A.  That's Woodycrest Avenue.

J365jar2                        Cassase - direct

1    Q.  And then the intersection that you can see at the top

2    left-hand corner of the video, what intersection is that?

3    A.  The left side, that's West 166 Street.

4              MR. NESSIM:  Ms. Lafever, if you would restart the

5    video to the beginning and pause it at about 40 seconds?

6              (Video played)

7              MR. NESSIM:  You can pause it there.

8    BY MR. NESSIM:

9    Q.  What is the car that pulled up?

10   A.  That's our vehicle.

11   Q.  The patrol vehicle?

12   A.  Yes.

13   Q.  What do you see along the fence of this video?

14   A.  I see a couple people.

15   Q.  Who are those people?

16   A.  Those are people that were in the group.

17   Q.  The group that you mentioned that you observed on the --

18   A.  Correct.

19   Q.  -- sidewalk?

20   A.  Correct.

21   Q.  Is that the full group or is there more?

22   A.  No.  There is more people to the right of the screen.

23             MR. NESSIM:  And, Ms. Lafever, if you would continue

24   playing the video and we will stop playing at around 591

25   seconds in?

J365jar2                            Cassase - direct

1              (Video played)

2    Q.   What do you see happening now?

3    A.   That's the person all the way to the left, I believe that's

4    the defendant walking off, and all the other group is getting

5    up.

6              MR. NESSIM:   Let's just play it a little bit longer,

7    Ms. Lafever.

8    Q.   Which one is the defendant?

9              (Video played)

10   Q.   Pause it, please.

11   A.   The person all the way over, the farthest to the left.

12   Q.   What sort of -- what kind of clothing is he wearing or how

13   would you identify him?

14   A.   It looks like dark clothes and -- I can't -- it is a little

15   blurry.

16   Q.   Dark colors?

17   A.   Dark color, clothes it looks like, yeah.

18             MR. NESSIM:   Ms. Lafever, if you would keep playing

19   it?

20             (Video played)

21             MR. NESSIM:   And pause it for one moment.

22   Q.   What is this video showing now?

23   A.   This is me getting out of the car.

24   Q.   Where are you?

25   A.   I'm in the street.

J365jar2                          Cassase - direct

1    Q.  Can you describe which sort of, if we were dividing this

2    video into four boxes are you in the top left box, top right

3    box?

4    A.  I'm on the top wearing like a white -- like a light-colored

5    shirt in the street.

6              MR. MARCUS-AMELKIN:  Can he circle it?

7              MR. NESSIM:  Yes.

8              Ms. Lafever, will you circle where Officer Cassase is

9    identifying where he is located and please circle who is

10   identified as the defendant?

11   Q.  Are those circles drawn in the approximate locations that

12   you referenced?

13   A.  Yes.

14             MR. NESSIM:  Ms. Lafever, if you would keep playing

15   the video?

16             (Video played)

17             MR. NESSIM:  Stop it here.

18   Q.  What just happened?

19   A.  The defendant stopped and is now heading in the opposite

20   direction going northbound now.

21             MR. MARCUS AMELKIN:  Could the witness speak more

22   directly into the microphone?

23             THE WITNESS:  Yes.

24             THE COURT:  We are trying to record everything you.

25             The microphones aren't working so you have to speak

J365jar2                         Cassase – direct

1    louder.

2              MR. MARCUS AMELKIN:  I thought maybe that was the

3    issue.

4              MR. NESSIM:  Can we rewind it a few seconds

5    Ms. Lafever and remove the circles as well?

6              (Video played)

7    BY MR. NESSIM:

8    Q.  Pause it right there.

9              So, what just happened in the video?

10   A.  I am approaching the defendant from the street and the

11   defendant turned around and is now walking the opposite

12   direction.

13             MR. NESSIM:  Ms. Lafever, if you would play the video

14   for about three seconds and pause it at 1:05?

15             (Video played)

16   Q.  So, what is happening right now?

17   A.  I'm approaching the defendant from the sidewalk and he is

18   continuing to walk.

19             MR. NESSIM:  Ms. Lafever, one more second and pause

20   it, please?

21             (Video played)

22             MR. NESSIM:  Sorry, one more.

23             (Video played)

24   Q.  What just happened?

25   A.  The defendant started running across the street between

J365jar2                        Cassase – direct

1   those two cars and I am about to grab him.

2            MR. NESSIM:  Ms. Lafever, if you would continue

3   playing the video?

4            (Video played)

5   Q.  And what is happening now?

6   A.  At this point we are on the ground and I'm trying to grab

7   him, take his arm out from underneath him.

8   Q.  Thank you.

9            Ms. Lafever, will you please pull up Government

10  Exhibit 4A?  And we will play this one all the way through

11  again.

12           (Video played)

13  Q.  Ms. Lafever, please rewind the video and start it again,

14  and Officer Cassase, if this time if you could narrate what the

15  video is showing?

16  A.  Sure.

17           (Video played)

18  A.  That's our vehicle pulling up.

19  Q.  At approximately 17 seconds?

20  A.  Yes.

21           That's the defendant walking on the left side right by

22  the tree now, we are in the street.  He turns, I approach him

23  on the sidewalk and he starts running right there.  He is down

24  on the street again.

25  Q.  What are those other figures on the screen?

J365jar2                         Cassase - direct

1   A.   Those are people that were in the group.

2   Q.   What are they doing?

3   A.   They're walking away now.

4   Q.   Do you remember if anyone remained from the group after you

5   arrested the defendant?

6   A.   What's that?

7   Q.   Do you remember if anyone was remaining from that group

8   when you arrested the defendant?

9   A.   No.

10  Q.   Sorry -- no, you don't remember, or no, nobody remained?

11  A.   No, not that I remember that anybody was there.

12          MR. NESSIM:  Your Honor, may I have one moment?

13          THE COURT:  Yes.

14          (Counsel conferring)

15  BY MR. NESSIM:

16  Q.   Ms. Lafever, we can take the video down.  Thank you.

17          Officer Cassase, were you issued an NYPD body camera

18  at this time?

19  A.   Yes.

20  Q.   When were you issued a body camera?

21  A.   Approximately April of 2018.

22  Q.   And when did this incident take place?

23  A.   May of 2018.

24  Q.   And what sort of training did you receive when you got your

25  body camera?

J365jar2                          Cassase - direct

1   A.   How you use it and when to use it.

2   Q.   And, what do you understand the policy to be about when to

3   use your body camera?

4   A.   When you, any time you do a car stop or certain jobs you

5   respond to, when you believe there is going to be a potential

6   crime in progress.

7   Q.   Did you use a body camera in this incident with the

8   defendant?

9   A.   No.

10  Q.   Why not?

11  A.   I -- I just got them so I wasn't used to it but when I got

12  out of the vehicle I -- I believed that he had a gun so there

13  is a certain, like, you get like a little nervous, you get an

14  adrenaline rush and I was more -- I have was focused on him, I

15  wasn't thinking about the camera at all.

16  Q.   Was your body camera on you at this time?

17  A.   Yes.

18  Q.   Did it remain on you for the entire incident?

19  A.   No.  At some point it flew off.

20  Q.   When did it fly off?

21  A.   I believe when I went to tackle the defendant.

22  Q.   Where did it end up?  Do you know?

23  A.   On the floor somewhere.  I don't remember where it was.

24  Q.   Over the course of your duties as a police officer, have

25  you ever been investigated by the CCRB?

J365jar2                              Cassase - direct

1    A.   Yes.

2    Q.   What is the CCRB?

3    A.   It's the Civilian Complaint Review Board and they basically

4    investigate -- they investigate incidents they believe that

5    weren't handled properly.

6    Q.   How many complaints have you had referred to the CCRB?

7    A.   Two.

8    Q.   And, how many were substantiated versus unsubstantiated?

9    A.   One was substantiated.

10   Q.   What do you remember about the substantiated incident?

11   A.   I don't remember the incident at all.

12   Q.   Do you know the nature of the complaint?

13   A.   Yeah.  They said it was a car stop.

14   Q.   Approximately how many car stops have you participated in

15   over your time on the NYPD?

16   A.   Hundreds.

17   Q.   Approximately how many car stops have you participated in

18   in a given night on your job?

19   A.   That all depends on the day, but I would say on average

20   probably about 10 to 20.

21   Q.   Did you speak with the CCRB investigators in connection

22   with this complaint?

23   A.   Yes.

24   Q.   And what did you tell them?

25   A.   I told them that I didn't remember the incident.

J365jar2                          Cassase - cross

1            MR. NESSIM:  One moment, your Honor?

2            THE COURT:  Yes.

3            (Counsel conferring)

4   Q.  And, were you truthful before the CCRB?

5   A.  Yes.

6            MR. NESSIM:  No further questions for this witness.

7            THE COURT:  Mr. Marcus Amelkin?

8            MR. MARCUS AMELKIN:  Thank you.

9   CROSS EXAMINATION

10  BY MR. MARCUS AMELKIN:

11  Q.  Let's start with where the government left off with the

12  CCRB.  The substantiated allegation was that you conducted an

13  illegal car search, correct?

14  A.  Yes.

15  Q.  And, basically, the facts of that case was that you and

16  your fellow officer ordered a man out of a car and then popped

17  his trunk and searched it?

18           MR. NESSIM:  Objection, your Honor.  The witness

19  testified he is not aware of the facts of the case.

20           MR. MARCUS AMELKIN:  That's not --

21           THE COURT:  Overruled.

22           MR. MARCUS-AMELKIN:  That's a misstatement of his

23  testimony.

24           THE COURT:  Overruled.

25           THE WITNESS:  What was the question?

J365jar2                        Cassase – cross

BY MR. MARCUS AMELKIN:

Q.  I said the facts of this case was that you and the fellow
officers ordered the man out of the car and then popped his
trunk and searched it.

A.  Okay.  I don't –– I don't remember that, but.

Q.  In preparing for your testimony did you review the CCRB
allegations?

A.  No.

Q.  You did not discuss them at all with the government?

A.  I know it was in regards to a car stop.

Q.  That's not the question I asked you.  Did you speak with
the prosecutors about the allegations in the CCRB?

A.  I was not told what the substantiated allegations were.

Q.  Even after the allegation was substantiated against you,
you weren't told what you did wrong?

A.  When I got the report a while ago I did, but not recently.

Q.  So, at the time when you received the report you learned
what you did wrong and what you did wrong was an illegal car
search, correct?

A.  Okay.

Q.  I'm asking you.

A.  Oh.  As far as the report goes, yes.

Q.  And you were punished for it?

A.  No.

Q.  You didn't receive any loss of vacation or anything like

J365jar2                           Cassase - cross

1    that?

2    A.  No.

3    Q.  Okay.

4          At the time of the stop you were in the 44th, which is

5    where you are now, right?

6    A.  I'm not in the 44th now.

7    Q.  I'm sorry.

8          You are in a larger anti crime unit or --

9    A.  I'm in Manhattan North Narcotics.

10   Q.  Okay.  Got it.

11         This incident took place in the 44th, though?

12   A.  According to the report, yes.

13   Q.  And at the time that this incident was -- the CCRB

14   occurred, were you working with the officers or sergeant that

15   you are working with now?

16   A.  You mean --

17   Q.  Any of the guys that were in the car when you arrested

18   Mr. Jarvis?

19   A.  I don't remember the incident so I don't remember who I was

20   riding with.

21   Q.  Do you remember when the incident was?

22   A.  No.

23   Q.  Would you like something to refresh your recollection?

24   A.  Yes.

25   Q.  The CCRB report would refresh your recollection as to when

J365jar2                          Cassase – cross

1   it occurred?

2   A.  Yes.

3          MR. MARCUS AMELKIN:  Permission to approach, your

4   Honor?

5          THE COURT:  Yes.

6          MR. NESSIM:  Your Honor, one second.  Objection.  It's

7   not clear that the witness has ever seen the CCRB report.

8          THE COURT:  He is using it to refresh his

9   recollection.

10          MR. NESSIM:  Okay.  He hadn't seen it before, from our

11   understanding.

12          THE COURT:  He will read it and he will see it and

13   determine whether or not his recollection is refreshed.

14          THE WITNESS:  All right.

15          MR. MARCUS AMELKIN:  Thank you.

16   BY MR. MARCUS AMELKIN:

17   Q.  So the substantiated complaint happened in 2017?

18   A.  Correct.

19   Q.  In March?

20   A.  Correct.

21   Q.  And, at that time, were you working with any of the same

22   officers who were in the same car the night that you arrested

23   Mr. Jarvis?

24   A.  I don't remember.

25   Q.  You don't remember a year and a half ago who were your

J365jar2                          Cassese - cross

1    partners?

2    A.  Correct.

3    Q.  All right.  And you told the CCRB you don't remember the

4    stop at all?

5    A.  Correct.

6    Q.  And your fellow officers who conducted the stop did the

7    same thing?

8    A.  I'm not sure.

9              MR. NESSIM:  Objection.

10             THE COURT:  Overruled.

11   BY MR. MARCUS AMELKIN:

12   Q.  But the CCRB determined that that was not credible?

13   A.  Excuse me?

14   Q.  The CCRB determined that it was not credible that all of

15   you didn't remember the stop?

16   A.  Correct.

17   Q.  Let's move on to the night in question.

18             There are four officers in the car?

19   A.  Correct.

20   Q.  The sergeant is the driver, right?  Sergeant Crane?

21   A.  I don't remember if he was driving or not.

22   Q.  You told the government he was in the front.

23   A.  Correct.

24   Q.  So he was either the driver or in the front passenger seat?

25   A.  Correct.

J365jar2                              Cassase - cross

1    Q.  And then Robert Cabrera, who is the same rank as you, was

2    the other guy in the front?

3    A.  Correct.

4    Q.  And you and Maria are in the back?

5    A.  Maria, yes.

6    Q.  Maria.  Thank you.

7         Is he on right or are you on the right?

8    A.  I don't remember.

9    Q.  You don't remember which side of the car you were on?

10   A.  Correct.

11   Q.  So, you remember getting out of the car, right?

12   A.  Correct.

13   Q.  You don't remember if the door swung to the left or to the

14   right?

15   A.  No.

16   Q.  Okay.

17        So, let's start with Sergeant Crane.  You have worked

18   with him before?

19   A.  Yes.

20   Q.  He is your immediate supervisor?

21   A.  At the time, yes.

22   Q.  At the time.

23        Did he help to train you at all?

24   A.  I have gotten experience from him.

25   Q.  And you have conducted several arrests with him before?

J365jar2                           Cassase – cross

1    A.  Correct.

2    Q.  How many do you think?

3    A.  I wouldn't be able to give you an accurate --

4    Q.  Over a hundred?

5    A.  I don't think it would be quite a hundred.

6    Q.  Okay, but certainly more than five or 10?  Somewhere?

7    A.  Yeah.

8    Q.  And what about Maria; how many arrests do you think?

9    A.  I don't know.

10   Q.  Okay.

11           And what about Cabrera?

12   A.  Same.  I don't know.

13   Q.  Okay.

14           So it's March 4th, basically; it is after midnight?

15           THE COURT:  Did you say March 4th?  May 4th, isn't it?

16           MR. MARCUS AMELKIN:  Sorry.  You are correct, your

17   Honor.  My apologies.

18   BY MR. MARCUS AMELKIN:

19   Q.  It is May 4th, it is after midnight.  You folks weren't

20   called to 166 and Woodycrest, correct?

21   A.  Correct.

22   Q.  There was no report of a crime?

23   A.  Correct.

24   Q.  There was no complaint about the group on the street?

25   A.  Correct.

J365jar2                          Cassase – cross

1   Q.   And before you got out of the car you had already driven by

2   the group once; is that correct?

3   A.   I don't remember.

4   Q.   I'm going to show you a video of the car driving by, I

5   think that might refresh your recollection looking at 1:01:36.

6              (Video played)

7   Q.   Is that your unmarked car driving by about 20 minutes

8   before you guys did the jump out?

9   A.   I don't know.

10  Q.   You were able to identify the car in the video when the

11  government was asking you those questions though, correct?

12  A.   The vehicle that I stepped out of, yes.

13  Q.   Right.  And you are not able to tell if this is the same

14  car?

15  A.   Correct.

16  Q.   So, you see a group of gays standing outside along the

17  fence; is that right?

18  A.   Correct.

19  Q.   Now, are all the windows down, of the car?

20  A.   My window was down.

21  Q.   And, again, you don't remember if you were on the left or

22  the right side of the car?

23  A.   Correct.

24  Q.   Do you know if the front windows were down?

25  A.   I don't remember.

J365jar2                              Cassase - cross

1   Q.  Now, it is early May, it is normally pretty cold.  Do you

2   remember what the weather was like?

3          THE COURT:  Are you testifying as a weatherman now,

4   Mr. Marcus Amelkin?

5          MR. MARCUS AMELKIN:  I'm sorry, your Honor.

6   Q.  Was it cold?

7   A.  I don't remember.

8   Q.  Were you wearing a jacket?

9   A.  No.

10  Q.  Okay.  Long pants?

11  A.  I don't remember.

12  Q.  Okay.

13  A.  Yes.  I was wearing jeans.

14  Q.  You were wearing jeans?

15  A.  Yes.

16  Q.  After the arrest was conducted you were interviewed for the

17  complaint report; is that right?

18  A.  Say that again?

19  Q.  You were interviewed by another officer in the unit so the

20  complaint report that was filled out?

21  A.  I don't remember.

22          MR. MARCUS-AMELKIN:  Permission to approach to refresh

23  the witness' recollection?

24          THE COURT:  Yes.

25          THE WITNESS:  Okay.

J365jar2                          Cassase – cross

1   Q.   When you fill out complaint reports in your job, it is an

2   important part of your job, yes?

3   A.   Correct.

4   Q.   You want them to be complete?

5   A.   Correct.

6   Q.   And accurate?

7   A.   Correct.

8   Q.   Because they're going to be used in investigations?  Yes?

9   A.   Correct.

10  Q.   And in litigation?  Is that right?

11  A.   What's that.

12  Q.   It is going to be used in litigation, in court?

13  A.   Correct.

14  Q.   And, at the time this complaint report was filled out, you

15  told your fellow officer that you observed a group of males

16  drinking on the corner of 166 and Woodycrest, correct?

17  A.   If that's what it says, yes.

18  Q.   Would you like the opportunity to have your recollection

19  refreshed again?

20  A.   Yeah.

21  Q.   Okay.

22          THE COURT:  Are you going to mark that as an exhibit?

23          MR. MARCUS AMELKIN:  I don't know if I will put it in.

24  If you want me to, yes, I will.  I will mark that for

25  identification as Defendant's Exhibit A.

J365jar2                        Cassase – cross

1              Your Honor, I move this into evidence at this time.

2              MR. NESSIM:  No objection.

3              THE COURT:  A is in evidence.

4              (Defendant's Exhibit A received in evidence)

5              MR. MARCUS-AMELKIN:  I will pass this up to the Court,

6    if that's okay with you?

7              THE COURT:  Sure.

8    BY MR. MARCUS AMELKIN:

9    Q.  In the complaint report you did not mention marijuana; is

10   that correct?

11   A.  Correct.

12   Q.  You also filled out your memo book for this arrest?

13   A.  Correct.

14   Q.  And, just like the complaint report, it is important that

15   those are accurate and complete, right?

16   A.  Correct.

17   Q.  And, in your memo book you did not mention the smell of

18   marijuana; is that correct?

19   A.  If that's what it says, yes.

20   Q.  Let's just make sure we are on the same page.

21             MR. NESSIM:  Your Honor there is nothing to refresh.

22   The witness hasn't said he doesn't remember yet.

23   BY MR. MARCUS AMELKIN:

24   Q.  Do you remember what you wrote in your memo book.

25   A.  Not offhand.

J365jar2                              Cassase - cross

1   Q.  Would your memo book refresh your recollection?

2   A.  Yes.

3   Q.  Thank you.

4            Your memo book did not mention marijuana, correct?

5   A.  Not from my entry, no.

6   Q.  In the memo book you did write that the group that you

7   approached was disorderly, is that right?

8   A.  Yes.

9   Q.  Now, disorderly conduct has a specific definition in New

10  York?

11  A.  Okay.

12  Q.  There are certain -- it's a law, correct?

13  A.  Correct.

14  Q.  And to be disorderly under the law, isn't it true that a

15  person has to have intent to cause public inconvenience,

16  annoyance, or alarm?

17  A.  Yes.

18  Q.  Were the men on the street fighting?

19  A.  No.

20  Q.  Or being unreasonably loud?

21  A.  Not that I heard.

22  Q.  Were they disturbing anyone else on the street?

23  A.  Not that I know of.

24  Q.  Now, you said you saw them drinking, right?

25  A.  Yes.

J365jar2                          Cassase - cross

1   Q.  And you said you smelled marijuana?

2   A.  Yes.

3   Q.  Did you see bottles of liquor?

4   A.  I don't remember.

5   Q.  Maybe just cups?

6   A.  Yes, I seen cups.  I don't remember if it was bottles lying

7   around.

8   Q.  Did the cups have any alcoholic beverage insignia on them?

9   A.  I don't remember.

10  Q.  You don't remember what the cups looked like?

11  A.  I know it was white cups.  I don't know if others had

12  labels on them.

13  Q.  Could you smell the alcohol from the car?

14  A.  No.

15  Q.  So, you didn't know when you approached the group that

16  there was alcohol in the cups, correct?

17  A.  Correct.

18  Q.  Did you see Mr. Jarvis holding a cup?

19  A.  I don't remember.

20  Q.  Did you see him holding any bottles of alcohol?

21  A.  I don't think so.

22  Q.  Is it a crime to stand next to somebody else on the street

23  who has an open container?

24  A.  No.

25  Q.  Let's just talk about the marijuana.  Did you see

J365jar2                                Cassase – cross

1    Mr. Jarvis holding marijuana?

2    A.   No.

3    Q.   Did you see him smoking it?

4    A.   No.

5    Q.   And is it a crime to stand next to somebody on the street

6    who is smoking marijuana?

7    A.   No.

8    Q.   Now, was anybody arrested for the marijuana?

9    A.   No.

10   Q.   And was anyone else in the group arrested at all?

11   A.   No.

12   Q.   Was anyone ticketed, received a pink summons for open

13   container?

14   A.   No.

15   Q.   Did you recover any of the alcohol?  Did you voucher any of

16   the alcohol?

17   A.   No.

18   Q.   How about the marijuana?

19   A.   No.

20   Q.   Nothing illegal or criminal was vouchered except for the

21   gun, right?

22   A.   Correct.

23   Q.   Did you take any photos of the alcohol?

24   A.   No.

25   Q.   Photos of the marijuana?

J365jar2                          Cassase - cross

1    A.  No.

2    Q.  Did anybody's body cam pick up the cups or the weed?

3    A.  I'm not sure.

4             THE COURT:  Excuse me.  What do you mean cops of the

5    week?

6             MR. MARCUS-AMELKIN:  Cups or the weed.

7             THE COURT:  Oh.  I misheard.

8             MR. MARCUS-AMELKIN:  That's my fault.

9    BY MR. MARCUS AMELKIN:

10   Q.  Did any of the alleged marijuana get field tested?

11   A.  No.

12   Q.  And you didn't take any of the cups back to confirm that

13   there was alcohol in them?

14   A.  Correct.

15   Q.  So, let's pull up 3A.  Thank you.  This is already in

16   evidence, it is the government's exhibit.

17            (Video played)

18            THE COURT:  This is the body cam video?

19            MR. MARCUS AMELKIN:  4A.  I apologize.

20            THE COURT:  4A or 5A?

21            MR. MARCUS AMELKIN:  5.  The government can play it.

22   It is always collegial during hearings.

23            (Video played)

24   BY MR. MARCUS AMELKIN:

25   Q.  We have watched it now a couple times but I think it will

J365jar2                           Cassase - cross

1    be good if you watch it once more and we will discuss it

2    without breaking it down again.

3              (Videofile played)

4    Q.  Is it not just Mr. Jarvis walking here but multiple other

5    people walking?

6    A.  I see one person, yes.

7    Q.  And at that point right there, you guys are already on the

8    ground; is that right?

9    A.  Correct.

10   Q.  Thank you.

11             So, as you drove up, did all four officers exit the

12   car?

13   A.  I'm not sure.  Once I saw the defendant, I was pretty

14   focused on him and I didn't see much of what was going on.

15   Q.  Would you all mind taking down the video?  Thank you so

16   much.

17             As an soon as you exited did you announce yourself as

18   the police?

19   A.  Yes.

20   Q.  Did you display a badge?

21   A.  I don't remember.

22   Q.  You had your badge on you, I imagine?

23   A.  Yes.  Usually I have it around my neck.  I don't remember

24   if it was out or not.

25   Q.  Okay.  And the group dispersed the when you exited car; is

J365jar2                          Cassase - cross

1    that right?

2    A.  Yeah.  I was focused on the defendant, I wasn't paying

3    attention to the people.

4    Q.  You just watched video, right?

5    A.  Yes.

6    Q.  It looks like people got up who were sitting, right?

7    A.  Correct.

8    Q.  And at least another person walked south on Woodycrest?

9    A.  Correct.

10   Q.  And is it common for police to clear sidewalks?

11   A.  What do you mean by that?

12   Q.  I mean if there is a group congregated on sidewalks, is it

13   common for the police to step out and say *Move along, let's*

14   *disperse.*

15   A.  It does happen.

16   Q.  And, at first you noticed Mr. Jarvis walking away, right?

17   A.  Correct.

18   Q.  And he was not running?

19   A.  Correct.

20   Q.  Now, you testified that he had adjusted something in his

21   waistband, right?

22   A.  Correct.

23   Q.  And that was the first thing that tipped you off that maybe

24   he had a weapon?

25   A.  Yeah.

J365jar2                          Cassase – cross

1   Q.  In fact, there was no indication whatsoever that Mr. Jarvis

2   had committed a crime in your mind before you saw that; is that

3   right?

4   A.  You can say that.

5   Q.  Can you say that?

6   A.  Yes.

7   Q.  Okay.

8        And, you testified that it looked like he moved the

9   item from his waist to his side; is that right?

10  A.  Yes, slightly.  I wouldn't say he moved it all the way but

11  adjusted it, yes.

12  Q.  A slight movement.  Okay.

13       Now, you were interviewed by the federal agent in this

14  case for the complaint; is that right?

15  A.  What was that?

16  Q.  Were you interviewed by the federal agent sitting at the

17  government's table for the federal complaint in this case?

18  A.  Yes.

19  Q.  And, did you review the complaint when Mr. Jarvis was

20  brought to federal court?

21  A.  I don't remember.

22  Q.  Did you mention to the agent that Mr. Jarvis adjusted

23  something in his pants to the federal officer?

24  A.  I don't remember.

25  Q.  But it was not included in the complaint; is that right?

J365jar2                        Cassase - cross

1    A.   I'm not sure.

2    Q.   Would the complaint refresh your recollection?

3    A.   Yes.

4            THE COURT:  What's the question, Mr. Marcus Amelkin?

5            MR. MARCUS AMELKIN:  If he told the federal agent

6    about the waistband adjustment because it is not included in

7    the complaint.

8            MR. NESSIM:  Your Honor, the complaint wouldn't

9    illuminate that point.

10           THE COURT:  So you say.

11           MR. NESSIM:  There are notes of the interview.  If it

12   is not in the complaint is beyond this officer's scope of

13   knowledge.

14           MR. MARCUS AMELKIN:  Your Honor, the government is

15   testifying.

16           THE COURT:  If that's an objection, Mr. Nessim, it is

17   overruled.

18           MR. MARCUS AMELKIN:   Thank you.

19   BY MR. MARCUS AMELKIN:

20   Q.   In the federal complaint does it mention that Mr. Jarvis

21   adjusted his waistband?

22   A.   No.

23   Q.   Let's go back to the pants.  Did you see anything sticking

24   out of his waistband?

25   A.   I don't.  I don't remember that.

J365jar2                          Cassase - cross

1   Q.  You don't remember if anything was sticking out?

2   A.  Correct.

3   Q.  But you didn't see the butt of a gun, right?

4   A.  I don't believe so.

5   Q.  And, you didn't see a bulge in his pants?

6   A.  That I don't remember.

7   Q.  You don't remember if you saw a bulge?

8   A.  No.

9   Q.  So, really the only thing we know for sure is that you saw

10  a slight adjustment in his pants, right?

11  A.  Correct.

12  Q.  Now, he was wearing a black hooded sweatshirt?

13  A.  Okay.

14  Q.  Was he?

15  A.  I don't remember.

16  Q.  Were you one of the officers who brought him into the

17  precinct?

18  A.  He was transported back to the precinct.  I don't

19  remember -- I didn't bring him back, someone else brought him

20  back.

21  Q.  I am going to show you a -- hold on a second.

22          (Counsel conferring)

23  Q.  I am going to show you one of the body cam cameras from

24  inside the precinct.  I am not sure who is shooting this but I

25  am pretty sure you are standing next to him?

J365jar2                          Cassase - cross

1   A.   Okay.

2   Q.   Is there a way we can do it with sound?

3            (Video played)

4   Q.   Was that you talking?

5   A.   Yes.

6   Q.   Thank you.  Do you mind rewinding it for a second?

7            (Video played)

8   Q.   Did you hear in the video Mr. Jarvis say:  *I'm wearing Nike*

9   *pros*.

10  A.   No, but.

11  Q.   Okay.  Mr. Gosrani, do you mind replaying it?

12           (Video played)

13  Q.   Did you hear that then?

14  A.   Yes.

15  Q.   I'm going to show you what's marked for identification

16  Defendant's B.  Officer, are you familiar with these types of

17  pants?  Like in your personal life?

18  A.   Yeah.

19  Q.   And is it, does it say on the pants that this is Nike pro

20  or Nike PR?

21  A.   Yes.

22  Q.   And, after seeing the video, do you remember that these

23  were the type of pants that Mr. Jarvis was wearing under his

24  jeans the night of his arrest?

25  A.   I don't remember seeing it.

J365jar2                          Cassase - cross

Q.  I'm going to show you the video again because you kind of

see the pants toward the end.  See if that refreshes your

recollection.

A.  Okay.

          (Video played)

Q.  Did you ask him how many pants you got on, bro?

A.  Yes.

Q.  Thank you.  Go ahead.

          (Video played)

Q.  After seeing a brief glimpse of those pants in the video,

does it refresh your recollection that he was wearing these

type of leggings on the night of his arrest?

A.  I mean, I'm not saying by the look of it, but --

          MR. MARCUS-AMELKIN:  Your Honor, I ask to move

Defendant's Exhibit B into evidence.

          THE COURT:  Are those the pants that he was wearing?

          MR. MARCUS AMELKIN:  It is a depiction of them from

the Nike website.

          MR. NESSIM:  Your Honor, we object on relevance

grounds.  It is not clear these were the pants he is wearing,

there is no foundation for it.  He apparently said Nike in the

video.

          THE COURT:  Sustained.  Sustained.

          MR. MARCUS AMELKIN:  Thank you, your Honor.

BY MR. MARCUS AMELKIN:

J365jar2                          Cassase – cross

1    Q.  But in the video he did say that he was wearing Nike Pro

2    leggings, correct?

3    A.  That is correct.

4    Q.  And he was wearing a pair of jeans over those Nike pros,

5    correct, because you took his belt from the jeans?

6    A.  Yes.

7    Q.  And, underneath the Nike Pros he was wearing boxer shorts

8    as he said in the video?

9    A.  Okay.

10   Q.  Was he wearing boxer shorts?

11   A.  I don't remember.  If that's what he said.

12   Q.  And, in your experience with these types of pants just as a

13   consumer, as a person, you know that they're tight athletic

14   pants, correct?

15   A.  Correct?

16   Q.  And they hug your body in a way that compresses?

17   A.  Correct.

18   Q.  Now, you can say that they're skin tight, right?

19   A.  Correct.

20   Q.  So, let's go back to the arrest.

21        You saw him adjust something in his waistband, as you

22   said, and you told him to stop?

23   A.  Correct.

24   Q.  Instead, he walked away?

25   A.  Correct.

J365jar2                              Cassase - cross

1    Q.  And then, in a matter of seconds, he was on the ground; is

2    that right?

3    A.  Correct.

4    Q.  Maybe, just from having watched the video now three times,

5    would you agree that from the time you stepped out of the car

6    until the time Mr. Jarvis was on the ground it was less than 10

7    seconds?

8    A.  I think it was more than that, but.

9    Q.  Would you like to watch it again?

10   A.  Sure.

11            THE COURT:  Do you have a question,

12   Mr. Marcus Amelkin?

13            MR. MARCUS AMELKIN:  We are going to show him the

14   video, your Honor.  I'm sorry.  I asked him how long between he

15   stepped out of the car until Mr. Jarvis was tackled.

16            THE COURT:  Well, he won't be able to tell unless you

17   have the time up.

18            MR. MARCUS AMELKIN:   Sorry.

19            Would the government mind showing theirs again?  I'm

20   sorry.  I think it starts at 40 seconds, right?

21            (Video played)

22            THE COURT:  Is that your car arriving, officer?

23            THE WITNESS:  I don't have anything on my screen.

24            THE COURT:  He doesn't have anything on his screen.

25            MS. CHOI:  Your Honor, I noticed this before.  You may

J365jar2                         Cassase - cross

1   want to try to hit the power button on the right-hand side of

2   the monitor.

3             THE COURT:  Do you have 34 seconds, Officer?

4             THE WITNESS:  Yes.

5             THE COURT:  We are at 34 seconds.

6             MR. MARCUS AMELKIN:  Thank you, your Honor.

7             (Video played)

8   BY MR. MARCUS-AMELKIN:

9   Q.  So the car is stopping now, right?

10  A.  Correct.

11            (Videofile played)

12  Q.  At that point is he on the ground at 1:10, right?

13  A.  Correct.

14  Q.  So, we are talking about 15, 20 seconds at most, right?

15  A.  Correct.

16  Q.  Thank you.

17            And thank you to the government for displaying the

18  video.

19            So, to the extent that he sped up it was only for a

20  couple steps before he was on the ground, right?

21  A.  Correct.

22  Q.  And, did you notice the adjustment of the waistband while

23  you were in the car?

24  A.  Yes.

25  Q.  So you saw him adjust his waistband from the back seat of

J365jar2                           Cassase - cross

1   the car?

2   A.  Yes.

3   Q.  So, from the back seat of the car to -- now, there were

4   cars -- I apologize.

5           There were cars between you and Mr. Jarvis parked on

6   the street, correct?

7   A.  Correct.

8   Q.  And this was at night?

9   A.  Correct.

10  Q.  And you are in the back seat of the car?

11  A.  Correct.

12  Q.  And how, approximately, far were you from him when you saw

13  this adjustment?

14  A.  The car from the street, so maybe like 10 feet.

15  Q.  And you didn't run out of the car, correct?

16  A.  No.

17  Q.  There was no emergency at that point?

18  A.  Well, it was more for my safety, I would say.

19  Q.  But there wasn't -- at that point you didn't know that he

20  had a gun, right?

21  A.  No, I didn't know.

22  Q.  And there was no urgency at that point?  He was walking

23  away, right?

24  A.  I wouldn't say there wasn't any urgency.

25  Q.  But when you stepped out of the car you were fully intent

J365jar2                          Cassase – cross

1   on stopping him, right?

2   A.   Correct.

3   Q.   And, he basically had taken only a few steps before you

4   tackled him, right?

5   A.   Correct.

6   Q.   And it was a pretty full tackle, right?  Did you wrap your

7   arms around him?

8   A.   Yes.  From what I remember, yeah.

9   Q.   You wrapped up both of his arms, right?

10  A.   Yeah.  I believe so.

11  Q.   Because he landed on his face, right?

12  A.   From what I remember, yes.

13  Q.   Because he couldn't -- you had his hands wrapped up so he

14  couldn't use them to stop his fall, right?

15  A.   From what I remember, yes.

16  Q.   And, at that point you were on top of him and other

17  officers came to assist?

18  A.   Correct.

19  Q.   And one of them searched, basically, while the other one

20  cuffed or did you cuff him?

21  A.   I don't remember if I cuffed him or not.

22  Q.   And, once he is handcuffed, then the gun is taken out from

23  his underwear, right?  Or from under the Nike pros?

24  A.   I don't he remember which one came first.

25  Q.   At that point, though, once you tackled him, Mr. Jarvis was

J365jar2                              Cassase - cross

1    not free to go, right?

2    A.   I think -- what was that?

3    Q.   He was not free to go at that point, correct?

4    A.   Correct.

5    Q.   He was under arrest?

6    A.   Correct.

7    Q.   And you tackled him with the intention of arresting him,

8    right?

9    A.   Well, to stop him.

10   Q.   You told the grand jury in this case, right, that you took

11   him to the ground because you believed he had a gun, right?

12   A.   Correct.

13   Q.   And was Mr. Jarvis' face injured when you tackled him?

14   A.   What's that?

15   Q.   Was his face injured when you tackled him?

16   A.   I believe so.

17   Q.   Now, once the arrest was conducted, did you voucher any of

18   Mr. Jarvis' clothes?

19   A.   I don't remember.

20   Q.   Would the voucher sheets refresh your recollection?

21   A.   Yes.

22           MR. MARCUS AMELKIN:  Permission to approach?

23           THE COURT:  Yes.  Yes.

24   Q.   There is a bunch of them, they go front to back?

25   A.   What was the question?

J365jar2                          Cassase - cross

1    Q.   If you vouchered any clothes.

2    A.   The only thing I see here are gloves.

3    Q.   So, to the best of your recollection you didn't voucher any

4    of his clothes besides some gloves?

5    A.   Correct.

6    Q.   And, in your experience, when a person is transported from

7    the precinct to Rikers Island, does the property clerk at the

8    jail take the clothes until that person is bailed or released?

9              MR. NESSIM:  Objection.  Foundation.

10             MR. MARCUS AMELKIN:  I asked him his experience as an

11   NYPD officer.

12             THE COURT:  If he knows.

13             Do you know, Officer?

14             THE WITNESS:  I don't know.

15   BY MR. MARCUS AMELKIN:

16   Q.   That's fine.

17             Just a few more questions about the body cam

18   situation.  When you arrested him you were wearing a body cam,

19   correct?

20   A.   Yes.

21   Q.   And the month prior to this arrest you were trained how to

22   use that camera, right?

23   A.   Correct.

24   Q.   And, you knew where the on and off button was, right?

25   A.   Correct.

J365jar2                          Cassase - cross

1    Q.  And you know, under patrol guide policy, that it is

2    mandatory, under the NYPD rules, to turn it on prior to

3    engaging in police action such as this one; is that right?

4    A.  Correct.

5    Q.  And that would be turning it on before you exited the car,

6    right?

7    A.  In some situations, yes.

8    Q.  In this situation?

9    A.  Yes.

10   Q.  But you only turned it on after Mr. Jarvis was under

11   arrest, right?

12   A.  I didn't turn mine on at all as far as I know.  It fell

13   off.

14   Q.  When you are speaking in the video with him in the

15   precinct, that's another officer's camera, that's not yours?

16   A.  I'm not sure.  I don't remember.

17   Q.  But, none of the four officers in the car, as far as you

18   know, were able to capture the approach or the tackle; is that

19   right?

20   A.  As far as I know, correct.

21             MR. MARCUS AMELKIN:  Thank you.  No further questions.

22             Oh.  Let me check with my client to make sure.

23             (Defendant and counsel conferring)

24             MR. MARCUS AMELKIN:  Thank you, Officer.

25             Thank you, your Honor.

J365jar2                          Cassase - redirect

1              THE COURT:  Mr. Nessim?

2    REDIRECT EXAMINATION

3    BY MR. NESSIM:

4    Q.  Officer Cassase, Mr. Marcus Amelkin asked you questions

5    about the complaint report, he showed you a copy of it.  Do you

6    remember that?

7    A.  Correct.

8    Q.  And I mean the precinct report back in the station.  Do you

9    remember that?

10   A.  The complaint report you are talking about?

11   Q.  Sorry?

12   A.  The complaint report?

13   Q.  I believe it is in evidence, the complaint report, just the

14   one page.

15   A.  Okay.

16   Q.  A few lines?

17   A.  Yes.

18   Q.  Did you review this report before it was filed in the case

19   file?

20   A.  No.

21   Q.  Do you know if the report contains all of the information

22   that you had about the incident?

23   A.  No, I don't know that.

24   Q.  And, do you know if it even contains all the information

25   that you told the officer who took your statement?

J365jar2                           Cassase - redirect

1    A.  No.

2    Q.  Do you remember Mr. Marcus Amelkin showed you a copy of the

3    criminal complaint in this case, the federal criminal

4    complaint?

5    A.  Yes.

6    Q.  Had you ever seen that before?

7    A.  No.

8    Q.  You never saw it so you never reviewed it?

9    A.  No.

10   Q.  Do you remember coming down to interview with the U.S.

11   Attorney's office in connection with this case?

12   A.  Yes.

13   Q.  Do you remember approximately when that interview was?

14   A.  No.

15   Q.  You don't remember?

16   A.  No.

17   Q.  Would something refresh your recollection?

18   A.  Yes, the --

19           MR. NESSIM:  Your Honor, may I approach the witness?

20           THE COURT:  Yes, you may.

21           MR. MARCUS AMELKIN:  Your Honor, I believe that if

22   Mr. Nessim is showing him notes from their meeting he should

23   only look at it as for the date and not to refresh his

24   recollection as to what he said to the government at those

25   meetings.

J365jar2                         Cassase - redirect

1            THE COURT:  I disagree with that.

2            The objection is overruled.

3   BY MR. NESSIM:

4   Q.  Does that refresh your recollection as to when you first

5   met with the government?

6   A.  Yes.

7   Q.  When was that?

8   A.  May 17, 2018.

9   Q.  Thank you.  You can put that aside.

10           Do you remember that first meeting with the government

11  where you mentioned smelling marijuana?

12  A.  I don't.

13  Q.  Would something refresh your recollection?

14  A.  Yes.

15           MR. NESSIM:  Can I direct the officer to his notes?

16           THE COURT:  Yes.

17           MR. MARCUS AMELKIN:  Your Honor, how could

18  Mr. Nessim's notes of the meeting refresh his recollection what

19  he said to him?

20           THE COURT:  Almost anything can be used to refresh a

21  person's recollection.  Could be the New York Times, could be a

22  Topps bubble gum card.

23           MR. NESSIM:  Your Honor, if can I direct him?

24           THE COURT:  Yes.

25  BY MR. NESSIM:

J365jar2                          Cassase - redirect

1   Q.  Does that refresh your recollection?

2   A.  Yes.

3   Q.  What, if anything, did you tell the government about

4   smelling marijuana on May 17?

5   A.  That I could smell it and my window was down.

6   Q.  Do you remember telling the government anything about

7   seeing the defendant adjust his waistband?

8   A.  I don't remember.

9          MR. NESSIM:  Your Honor, may I refresh the witness'

10  recollection?

11         THE COURT:  Yes.

12  Q.  Does that refresh your recollection?

13  A.  Yes.

14  Q.  What did you tell the government about adjusting the

15  waistband, if anything?

16  A.  That I saw him adjust the waistband.

17  Q.  Do you remember, did you testify in the Bronx grand jury on

18  this case?

19  A.  Yes.

20  Q.  Do you remember approximately when that testimony was?

21  A.  No.

22  Q.  Would something refresh your recollection?

23  A.  Yes.

24         MR. NESSIM:  Your Honor, may I approach the witness?

25         THE COURT:  Yes, you may.

J365jar2                          Cassase - redirect

1    BY MR. NESSIM:

2    Q.  Does that refresh your recollection on when your testimony

3    in the Bronx grand jury was?

4    A.  Yes.

5    Q.  When was it?

6    A.  May 15, 2018.

7    Q.  Did you testify in the Bronx grand jury about smelling

8    marijuana from the group?

9    A.  I don't remember.

10   Q.  Would something refresh your recollection?

11   A.  Yes.

12          MR. NESSIM:  Your Honor, may I?

13          THE COURT:  Yes.

14   Q.  Does that refresh your recollection?

15   A.  Yes.

16   Q.  What, if anything, did you tell the Bronx grand jury about

17   smelling marijuana?

18   A.  That I smelled marijuana.

19   Q.  Where?

20   A.  Coming from the area where the group was.

21   Q.  Do you remember telling the Bronx grand jury anything about

22   the defendant adjusting an object in his waistband?

23   A.  No.

24   Q.  Would something refresh your recollection?

25   A.  Yes.  Sorry.

J365jar2                          Cassase - redirect

1    Q.  Does that refresh your recollection?

2    A.  Yes.

3    Q.  What, if anything, did you tell the Bronx grand jury about

4    the defendant adjusting an object in his waistband?

5    A.  That I saw him adjusting an object in his waistband.

6    Q.  Do you remember seeing the defendant adjust an object in

7    his waistband?

8    A.  Yes.

9            THE COURT:  Where were you when you saw him making the

10   adjustment in the waistband?  Were you in the car?

11           THE WITNESS:  Yes.

12           THE COURT:  Before you got out of the car -- before

13   you got out of the car you had seen him adjust something in his

14   waistband, correct?

15           THE WITNESS:  Yes.

16           THE COURT:  That was about, approximately 10 feet

17   away?

18           THE WITNESS:  Yes.

19           THE COURT:  How did you see it?  There is cars

20   parked --

21           THE WITNESS:  In between the cars.

22           THE COURT:  You saw it in between the cars?

23           THE WITNESS:  Yes.

24           THE COURT:  You were on the far side or the near side?

25           THE WITNESS:  I don't remember.

J365jar2                              Cassase - redirect

1                    THE COURT:  Okay.

2    BY MR. NESSIM:

3    Q.  Did you continue to see him adjust his waistband at any

4    point after you exited the car?

5                    THE COURT:  When he was walking.

6                    THE WITNESS:  When he went to turn around I think he

7    grabbed it again.

8                    THE COURT:  Oh.

9    BY MR. NESSIM:

10   Q.  Mr. Marcus Amelkin asked you some questions about whether

11   you recovered cups or marijuana, whether you issued any arrest

12   or summonses for that?

13   A.  Correct.

14   Q.  You said did you not?

15   A.  Correct.

16   Q.  When you approached the group -- do you approach groups on

17   the street corner in your times as a police officer?

18   A.  Yes.

19   Q.  And what is sort of the range of possible outcomes of those

20   approaches?

21   A.  I don't understand.

22   Q.  When you seek to approach a group of people who are on the

23   street corner, what generally takes place?

24   A.  It all depends.  Sometimes we ask them to disperse,

25   sometimes we write summonses.  Sometimes there is, you know, it

J365jar2                              Cassase - redirect

1    escalates.

2    Q.  Mr. Marcus Amelkin asked you if you saw Mr. Jarvis holding

3    a cup or smoking marijuana and you said no.

4    A.  Correct.

5    Q.  Why did you stop Mr. Jarvis?

6    A.  Because I believed that he had a weapon.

7    Q.  Why did you believe he had a weapon?

8    A.  Really, the totality of everything.  The area where he was

9    when he first looked at me, the look in his face when he

10   started walking away, when he grabbed his waistband, when I

11   told him to stop he didn't stop.

12          It was really everything put together.

13   Q.  And the -- when you stopped Mr. Jarvis did you care about

14   the cups or the marijuana?

15   A.  No.

16   Q.  Why?

17   A.  Because I was worried about my safety and the fact that I

18   believed he had a gun.

19   Q.  There was questions about the pants or underpants that

20   Mr. Jarvis might have been wearing.

21   A.  Okay.

22   Q.  Do you remember those questions?

23   A.  Yes.

24   Q.  You said you don't remember the pants he was wearing or

25   underpants?

J365jar2                          Cassase - redirect

1    A.   No.

2    Q.   Do you remember him adjusting the waistband?

3    A.   Yes.

4    Q.   When you approached Mr. Jarvis, what did you say to him?

5    A.   I said:  *Police, hold up.*

6    Q.   How many times do you remember saying that?

7    A.   At least twice.

8    Q.   And what did he do in response?

9    A.   He said *for what?* and he started running.

10          MR. MARCUS AMELKIN:   Your Honor, objection.   This was

11   covered in direct.

12          THE COURT:   Overruled.

13   BY MR. NESSIM:

14   Q.   Ms. Lafever, if we could pull up, I know we have seen it

15   several times, Government Exhibit 5A, and we will turn to the

16   1:05 mark.

17          (Video played)

18   Q.   What just happened in the video?

19   A.   The defendant was running and I grabbed him.

20   Q.   And what happened to the group?

21   A.   They dispersed.

22   Q.   Was most of the group still there at the time you were

23   approaching the defendant?

24   A.   Yes.

25   Q.   What do you remember about the lighting of the street at

J365jar2                           Cassase - redirect

1    this time?

2    A.   There were lights.

3    Q.   You say it was well lit?

4    A.   I wouldn't say well lit but it was pretty lit, fairly lit.

5              MR. NESSIM:  One moment, your Honor.

6              (Counsel conferring)

7              MR. NESSIM:  Nothing further for this witness.

8              THE COURT:  Before you are excused, Officer --

9              MR. MARCUS AMELKIN:  Your Honor, may I ask a couple

10   questions?

11             THE COURT:  No.

12             Before you are excused, when you were sitting in the

13   car and you saw Jarvis, according to your testimony, adjust his

14   waistband --

15             THE WITNESS:  Correct.

16             THE COURT:  -- did you say there is a gun?  Did you

17   tell your fellow officers there is a gun?

18             THE WITNESS:  I -- I didn't say -- I don't remember

19   what I said but I didn't say that there was a gun but did I say

20   something that directed -- I didn't say that there was a gun

21   but I did mention something to my, my fellow officer in the

22   back seat with me and I don't remember what I said to him but

23   it was to direct our attention to him.

24             THE COURT:  You don't remember what you said?

25             THE WITNESS:  No, sir.

J365jar2                         Cassase - recross

1                THE COURT:  Mr. Marcus Amelkin, do you want to ask a
2    question?
3                MR. MARCUS AMELKIN:  If you don't mind.
4                THE COURT:  I don't mind.  You were interrupting me
5    before.
6                MR. MARCUS AMELKIN:  I didn't know you were asking
7    me -- oh, you have more questions?
8                THE COURT:  No, I don't.  Go ahead.
9                MR. MARCUS AMELKIN:  Thank you, your Honor.
10   RECROSS EXAMINATION
11   BY MR. MARCUS AMELKIN:
12   Q.  Before you testified before the Bronx grand jury at that
13   point you had met with the prosecutor, is that right?
14   A.  Yes.
15   Q.  And prepared for your testimony?
16   A.  Yes.
17   Q.  When you filled out your memo book you had not met yet with
18   a prosecutor, right?
19   A.  I don't remember.
20   Q.  Do you normally fill out your memo book on the day,
21   contemporaneously with an arrest?
22   A.  Shortly after I usually fill that out, yes.
23   Q.  And seeing the complaint report that is in evidence,
24   normally that is filled out almost immediately, right?
25   A.  The complaint report that was prepared by my or the

J365jar2                              Cassase - recross

1    interview?

2    Q.   The interview.

3    A.   I don't -- I'm not sure.

4    Q.   May I refresh your recollection with the date?  I am

5    grabbing the report.

6             THE COURT:  You are refreshing his recollection as to

7    what?

8             MR. MARCUS AMELKIN:  The date that the interview

9    occurred.

10            THE COURT:  The Defendant's Exhibit A, which is in

11   evidence, says the activity date is May 4th at the time of 8:30

12   in the morning.

13            MR. MARCUS AMELKIN:  Thank you, your Honor.

14   BY MR. MARCUS AMELKIN:

15   Q.   Now, at the time of this arrest it is 1:30 in the morning

16   basically, right?

17   A.   Approximately, yes.

18   Q.   And it is pitch black out other than street lights, right?

19   A.   I believe so.

20   Q.   And you are in the back of a police car?

21   A.   Correct.

22   Q.   But you don't remember which side of the car you are on,

23   right?

24   A.   Correct.

25   Q.   And you are looking through multiple parked cars, correct,

J365jar2                         Cassase - recross

1   to get to the sidewalk?

2   A.  Well, I can see between the cars.

3   Q.  But there were multiple cars parked?

4   A.  There were cars parked; that is correct.

5   Q.  Including a larger SUV I think we saw in the photograph,

6   right?

7   A.  Okay.

8   Q.  At that point you were able to see the first adjustment?

9   A.  Yes.

10  Q.  And, you testified during redirect that he might have

11  grabbed it again when he turned around; is that right?

12  A.  I believe so.

13  Q.  But you don't know for sure, correct?

14  A.  Correct.  Well, when I started running, he grabbed it.

15  Q.  Once the -- the one or two seconds before he hit the ground

16  you are saying he grabbed it?

17  A.  Correct.

18  Q.  At the time that you were approaching Mr. Jarvis, the other

19  members of the group were already walking, correct?

20  A.  When I initially walked up to him?

21  Q.  Yes.

22  A.  Yes.

23  Q.  They were walking away, correct?

24  A.  What's that?

25  Q.  They were walking away, correct?

J365jar2                         Maria - direct

1    A.   Correct.

2    Q.   And when you asked Mr. Jarvis to stop, did he say to you,

3    *For what?*

4    A.   The -- right before he ran, yes.

5    Q.   And did you answer him?

6    A.   No.

7              MR. MARCUS-AMELKIN:   Thank you, your Honor.

8              Thank you, Officer.

9              THE COURT:   You are excused.

10             THE WITNESS:   Thank you.

11             (Witness excused)

12             THE COURT:   Call next witness.

13             MR. NESSIM:   Thank you, your Honor.   The government

14   calls Officer Daniel Maria.

15    DANIEL MARIA,

16        called as a witness by the Government,

17        having been duly sworn, testified as follows:

18             THE COURT:   Please sit down, Mr. Maria.

19             Okay, Mr. Nessim.

20   DIRECT EXAMINATION

21   BY MR. NESSIM:

22   Q.   Good morning, Officer Maria.

23   A.   Good morning.

24   Q.   Where do you work?

25   A.   44th Precinct in the NYPD in the south Bronx.

J365jar2                          Maria - direct

1   Q.   The 44th Precinct is in the south Bronx?

2   A.   Yes.

3   Q.   How long have you been with the NYPD?

4   A.   About six years.

5   Q.   What is your title?

6   A.   Police officer.

7   Q.   Do you work in a particular unit?

8   A.   I work in anti-crime.

9   Q.   How long have you been in anti-crime?

10  A.   About three years.

11  Q.   What are your duties and responsibilities -- generally

12  speaking, what are your duties and responsibilities as an

13  anti-crime officer?

14  A.   We proactively address violent street crimes such as

15  robberies, burglaries, people with firearms, wanted people.

16  Pretty much anything that surrounds violence.

17  Q.   You mentioned firearms.  Have you been involved in firearms

18  arrests?

19  A.   Yes.

20  Q.   Approximately how many times have you been involved in

21  arrests related to firearms possession?

22  A.   At least 20, 25 times.

23  Q.   Directing your attention to the evening of May 3rd into the

24  morning of May 4, 2018, were you working that night?

25  A.   Yes.

J365jar2                        Maria - direct

1   Q.   What shift were you working?

2   A.   I was working 2130 by 0605 hours.

3   Q.   Were you working with other officers that night?

4   A.   Yes.

5   Q.   Who were you working with?

6   A.   Officer Cassase, Officer Cabrera, and Sergeant Crane.

7   Q.   What were you wearing?

8   A.   Plain clothes.

9   Q.   What were the other officers wearing?

10  A.   Plain clothes as well.

11  Q.   How were you traveling?

12  A.   We were in an unmarked car.

13  Q.   Generally speaking, what were you doing on that shift that

14  night?

15  A.   We were just patrolling.

16  Q.   Patrolling what area?

17  A.   The west side of the precinct -- the 44th Precinct.

18  Q.   Do you remember where in the car you were sitting?

19  A.   I was sitting in the back seat of the car.

20  Q.   Do you remember where in the back seat?

21  A.   Not specifically.  I remember I was in the back seat of the

22  vehicle.

23  Q.   Directing your attention to approximately 1:00 a.m. on the

24  morning of May 4th, where were you at that time?

25  A.   I was on the corner of West 166th Street and Woodycrest

J365jar2                        Maria – direct

1    Avenue.

2    Q.   And what, if anything, happened at that time during your

3    shift?

4    A.   We approached the corner of 166 and Woodycrest just past

5    166 Street.  We observed a large group of people.  Some of them

6    were drinking, some of them were smoking, and there was a heavy

7    odor of marijuana in the air.

8    Q.   Ms. Lafever, if you would pull up Government Exhibit 1,

9    which is in evidence?

10             Using this map, can you identify the approximate area

11   where you came upon this group?

12   A.   Yes.  So, West 166th Street is right here and we were

13   traveling northbound on Woodycrest Avenue just past 166 Street.

14   Q.   Ms. Lafever, if you would circle that approximate area?

15             Is that the direction your car was moving?

16   A.   Yes.

17   Q.   Which corner did you say it was?

18   A.   It would be the east-northeast corner.

19   Q.   And what, if anything, did you know about rates of crime in

20   this neighborhood at this time?

21   A.   That area that surrounds Nelson playground, 165 to 166

22   Woodycrest and Nelson Avenue is a shooting prone location and

23   it's also a location that's known for narcotics sales.

24   Q.   When you say shooting prone, what does that mean?

25   A.   There is higher instance of shooting in that location than

J365jar2                         Maria - direct

1   other areas of the precinct so we are directed to patrol those

2   areas more heavily.

3   Q.  Ms. Lafever, if you could pull up Government Exhibit 2,

4   please?

5         Officer Maria, what does this show?

6   A.  That shows the corner of West 166 and Woodycrest Avenue.

7   Q.  Does this show the approximate area where you observed this

8   group of people?

9   A.  Yes.

10  Q.  Using this photo, can you identify roughly where that group

11  was standing?

12  A.  The second car on the left that you see in the screen, to

13  the third car.  That approximate area.

14  Q.  Approximately how many people did you observe?

15  A.  About 7 to 15 people, I would say.

16  Q.  And you mentioned an odor of marijuana.  How were you able

17  to smell that?

18  A.  The windows of our car were down.

19  Q.  What do you decide to do once you saw this group of people?

20  A.  We decided to get out of the car and address the group, let

21  them know that it was illegal to drink and smoke on the

22  sidewalk.

23  Q.  And, why did you decide to do that?

24  A.  It's part of our job to address groups of people.

25  Sometimes when large groups gets together and drink, later on

J365jar2                          Maria - direct

1    there can be problems in the night, and also it is illegal to

2    drink on the sidewalk in public.

3    Q.  In your experience, how does addressing groups of people

4    generally play out?

5              MS. SHROFF:  Objection.

6              THE COURT:  Overruled.

7              THE WITNESS:  In general, we will get out of the car

8    and, with most groups, the people, we will tell them it is

9    illegal to drink on the sidewalk and they can't stay there, and

10   usually they'll understand and move on.  Occasionally, if they

11   act a different way, they will either be summonsed or arrested.

12   BY MR. NESSIM:

13   Q.  So, you got out of the car to approach this group of

14   people.  What did you notice as you approached?

15   A.  I noticed a gentleman that was leaning on one of the cars

16   and he was rolling a blunt, like a marijuana in a cigar paper.

17   I started to walk towards him to talk to him about that, and at

18   that time I heard Officer Cassase calling out to someone else

19   and it was the defendant moving southbound on Woodycrest

20   Avenue.  And he called out to him twice and at that point I

21   changed -- I started walking on the sidewalk in attempt to get

22   ahead of him.

23   Q.  You mentioned the defendant.  Do you recognize the

24   individual that you saw in the courtroom today?

25   A.  Yes.

J365jar2                        Maria - direct

1   Q.  Can you identify him by where he is sitting and using an

2   item of clothing he is wearing?

3   A.  Yes.  He is -- wearing black.  He is in the second row,

4   wearing black, in the middle.

5          MR. NESSIM:  Your Honor, let the record reflect that

6   the witness has identified defendant?

7          THE COURT:  Mr. Marcus Amelkin?

8          MR. MARCUS AMELKIN:  Ms. Shroff's witness, your Honor.

9          MS. SHROFF:  No objection, your Honor.

10          THE COURT:  The officer recognized the defendant

11   Mr. Jarvis.

12   BY MR. NESSIM:

13   Q.  So, Officer Cassase saying something drew your attention to

14   Mr. Jarvis?

15   A.  Yes.

16   Q.  What happened next?

17   A.  He called out to him.  He said something of the nature of

18   *hey, stop* or, you know, *hold up a second.*  Mr. Jarvis was

19   walking southbound.  He went back towards Officer Cassase, he

20   looked kind of frantic, he was walking very quickly.  I felt

21   like he was going to run so I stepped up on the sidewalk and

22   started to move quickly towards him.  As that happened, he

23   quickly -- the defendant quickly changed direction and started

24   running to approximately where the two vehicles where the

25   circle is on the screen right now, he tried to get out between

J365jar2                        Maria - direct

1    those two cars, at which point Officer Cassase tackled him from

2    behind.

3    Q.  How far would you say the defendant got once he started

4    running?

5    A.  Not more than 10, 15 feet, max.

6    Q.  And, what happened next?

7    A.  As Officer Cassase tackled him, I noticed that the

8    defendant had his hand in the right side of his waistband

9    underneath his body.  I got up to the right side of his body

10   and reached underneath his -- reached underneath and I felt the

11   handle of a firearm inside his waistband and his hand on top of

12   it.

13   Q.  And using this exhibit on the screen, can you identify

14   approximately where the defendant was located on the ground?

15   A.  Yeah.

16        Just past where the cars are, the street-side tires of

17   the car onto the street just a little bit.

18   Q.  Is that roughly where that circle is being drawn?

19   A.  Yeah.

20   Q.  So you said as he fell what did you notice?

21   A.  His hand -- his right hand was underneath his body in his

22   waist area.

23   Q.  And what happened once he was on the ground?

24   A.  When he was on the ground, he began to squirm around.  My

25   co-workers were trying to get a hold of him.  When I reached

J365jar2                         Maria - direct

1    under his body I felt the firearm.  I said -- I called out

2    "gun" to them to let them know that there was a gun in his

3    waist, at which point I was able to pull his hand out from

4    under his waistband and one of my co-workers was able to grab

5    his arm and hold it still while I recovered the firearm.

6    Q.  So, you pulled his arm out and then you went back to

7    recover the firearm?

8    A.  Yes.

9         MS. SHROFF:  Objection.

10        MR. NESSIM:  Withdrawn, your Honor.

11        THE COURT:  Okay.

12   BY MR. NESSIM:

13   Q.  What about the defendant made you think to reach underneath

14   him?

15   A.  It was the way that his arm was tucked into his waist that

16   made me think that he had a firearm there.

17   Q.  What kind of gun was it that you recovered?

18   A.  It was a Glock semi-automatic pistol.

19   Q.  What did you do with the gun?

20   A.  Handed it to Officer Cassase.

21   Q.  What happened next?

22   A.  Next a vehicle arrived to transport the defendant back to

23   the precinct and I went back to the precinct.

24   Q.  Was the defendant placed under a rest?

25   A.  Yes.

J365jar2                          Maria - direct

1    Q.   When was he placed under arrest?

2    A.   The time he was handcuffed on the ground.

3    Q.   And when was that?

4    A.   At that time on scene.

5    Q.   Were you issued an NYPD body camera at this time?

6    A.   Yes.

7    Q.   When did you receive the camera?

8    A.   In April -- about a month prior to this incident.

9    Q.   Did you receive training in connection with the camera?

10   A.   Yes.

11   Q.   Ms. Lafever, we can take down this photo.

12            What sort of training did you receive?

13   A.   We went to the academy for one tour and they gave a

14   presentation and a practical walk-through how to use the

15   camera.

16   Q.   What do you understand to be the department policy on using

17   body cameras?

18   A.   When you are going to take enforcement action or when you

19   are responding to specific radio runs you will activate the

20   camera.

21   Q.   Did you activate the camera in this incident with the

22   defendant?

23   A.   I attempted to activate mine.

24   Q.   What happened?

25   A.   The plastic button on the front of my camera works with a

J365jar2                          Maria - direct

1    magnet on a plastic slide.  So, when I slid mine down, I slid

2    it down too quickly and it actually popped off.  When it popped

3    off, the camera never activated.

4    Q.  At what point did you attempt to activate your camera?

5    A.  At some point in time when he was running.

6    Q.  What did you need do to repair your camera?

7    A.  I called the ITB help desk and the gentleman on the phone

8    walked me through how to reattach the button, and he informed

9    me that if the button was broken -- if the slide was broken I

10   would have to bring the camera in to One Police Plaza.

11   However, I was able to reattach the button and he just issued

12   me a ticket number for that.

13   Q.  What is ITB?

14   A.  Information Technology Bureau.

15   Q.  I am going to show you what is already in evidence as

16   Government Exhibit 3A.

17         Ms. Lafever if you could pull up that video?  Is the

18   audio up?  Thank you.  So, we will watch it one time through

19   and then we will rewind it.

20         (Video played)

21   Q.  Thank you.

22         Why is the fist few seconds of the video silent?

23   A.  When you activate a camera, it loops constantly 30 seconds

24   but that 30 seconds doesn't have audio.  So, when you activate

25   the camera, you get 30 seconds of video prior to the

J365jar2                          Maria - direct

1   interaction.

2   Q.  So, let's replay this video and why don't you let us know

3   what is happening in the video as it is happening.

4   A.  Sure.

5          (Video played)

6   A.  These are my co-workers wrestling for the hands of

7   Mr. Jarvis.  Officer Cassase on the right, that's myself right

8   there.

9          (Video played)

10  A.  Here I recover the firearm from under his waist and they're

11  handcuffing him at this time.

12  Q.  Play it.

13         (Video played)

14  Q.  Can you identify when the handcuffs are being applied?

15  A.  Right now.  You can actually hear the handcuffs going on.

16  Q.  Was that after you pulled the gun out?

17  A.  They were securing his arms while I pulled the gun out, and

18  once the gun was out they were handcuffing him.

19  Q.  Keep playing.

20         (Video played)

21  Q.  What are you doing there?

22  A.  Here I noticed that my camera wasn't working because when

23  you activate it, it starts to blink green so when you look down

24  you sew a green light.  I looked down, I saw a red light after

25  everything was done.  And, I noticed that the button on the

J365jar2                          Maria - direct

1    front of my camera snapped off.

2    Q.  We can keep going.

3           (Video played)

4    A.  There you can hear Officer Cassase's voice and saying he

5    doesn't know where his camera is and Sergeant Crane is

6    responding that it fell.

7    Q.  We can take down that video.  Thank you, Ms. Lafever.

8           Officer Maria, over your experience as a police

9    officer, have you ever had complaints referred to the CCRB?

10   A.  Yes.

11   Q.  How long did you say you have been a police officer?

12   A.  Six years.

13   Q.  And how many complaints have been referred to the CCRB

14   regarding you?

15   A.  I think about --

16   Q.  To your knowledge.

17   A.  About three.

18   Q.  And how many have been substantiated, to your knowledge?

19   A.  Two.

20   Q.  Let's start with the first one.  Do you remember the

21   approximate date of the incident in question?

22   A.  No.  It was several years ago.

23   Q.  And, do you remember the circumstances of the incident?

24   A.  Yeah.

25           I was in a -- I was standing in a bodega and I was

J365jar2                         Maria - direct

watching a video for a robbery that had been committed.  I was

with the lieutenant and another officer and I interviewed the

store clerk.  And then, while my co-workers were watching the

video and then we kind of switched roles and I started watching

the video and they were interviewing the store clerk, while I

was watching the video the officer and lieutenant ran out the

door after somebody.  I chased closely behind them, hearing my

lieutenant saying, *stop that guy, stop that guy.*

Essentially the lieutenant had identified him as a

perpetrator for a crime.  I ran up and I grabbed ahold of him

and the subject of that CCRB, he actually resisted arrest.  I

was to stop him, he resisted arrest, we had to handcuff him.

We brought him back to the precinct.  He was not

positively identified for that crime that the lieutenant saw

him as, that guy.  I did think he had a similar jacket as to

the other person, the person that they did identify -- I mean,

as to the person that was wanted for the crime.  But, he wasn't

positively identified and I was substantiated for abuse of

authority for stopping the subject.

Q.  Were there any other substantiated allegations that you

know of in connection with that incident?

A.  No.

Q.  Did you speak with the CCRB about that incident?

A.  Yes.

Q.  Were you truthful in your conversations with them?

J365jar2                          Maria – direct

1    A.   Yes.

2    Q.   Was there any recommended process in response to that?

3    A.   Yes.  I was retrained.

4    Q.   For how long?

5    A.   I went for a day in the in-service tactical unit in

6    Rodman's Neck.

7    Q.   What about the second incident, approximately when did that

8    take place?

9    A.   I don't recall the exact date but it was also years ago.

10   Q.   What happened?

11   A.   I was working with one other co-worker who identified a

12   person as doing what he believed to be a hand-to-hand drug

13   transaction and this was a person that he had previously

14   arrested for a felony amount narcotics.  We approached him, one

15   of the women offered a bag holding it up and saying to me, *You

16   can search the bag, I am not doing anything, we don't have

17   drugs.*  I don't recall whether or not I actually looked into

18   that bag and there was another bag on the ground with a beer in

19   it and I looked inside of that bag.

20             One of the women had a seizure during this interaction

21   so I called an ambulance for her.  I walked out in the street,

22   waited for the ambulance to come because where we were it

23   wasn't visible from the street, it was in a court yard area.

24   Flagged the ambulance over, we got her in the ambulance and

25   that was the end of the interaction.

J365jar2                          Maria - cross

1   Q.  What, to your knowledge, was the outcome of the CCRB?

2   A.  Substantiated for abuse of authority again, I believe for

3   searching the bag.

4   Q.  Was there any sort of discipline or anything against you?

5   A.  CCRB recommended a schedule A command discipline and I

6   received counseling from my commanding officer and I didn't

7   hear anything after that.

8              MR. NESSIM:  Your Honor, may I have one moment?

9              THE COURT:  Yes.

10             (Counsel conferring)

11             MR. NESSIM:  Nothing further, your Honor.

12             THE COURT:  Mr. Marcus Amelkin?  Ms. Shroff?

13             MS. SHROFF:  Thank you, your Honor.  May I?

14             THE COURT:  Ms. Shroff, please.

15  CROSS EXAMINATION

16  BY MS. SHROFF:

17  Q.  Officer Maria, you started the shift on May 4th; is that

18  correct?

19  A.  That's not correct.

20  Q.  May 3rd at night?

21  A.  Yes.

22  Q.  And it went into May 4th?

23  A.  Yes.

24  Q.  And you started with a team, correct?

25  A.  Yes.

J365jar2                          Maria - cross

1    Q.   And the team gathered at the precinct before you took off

2    for the shift, correct?

3    A.   Yes.

4    Q.   You had a meeting with the team, correct?

5    A.   Sergeant holds roll call, yes.

6    Q.   Correct; but you also had a sub-meeting with the people

7    that were in your car, correct?  You talked with them about

8    what you were going to do on the shift?

9    A.   The Sergeant gives out directions on which car will go

10   where that night.

11   Q.   Right; and after the Sergeant gives out directions, you

12   talk to the people who are going to be in the car to decide

13   what to do, correct?

14   A.   I don't really understand the question.

15   Q.   Did you have a tactical plan at all for the shift?

16   A.   The sergeant will give us directions.  Maybe like sometimes

17   we will patrol the precinct in general, sometimes we will have

18   directions like one car will patrol the west side of the

19   precinct and another car will patrol the east side.  I don't

20   recall a particular direction given that night, however, we

21   were supposed to give special attention to the west side area

22   of the precinct.

23   Q.   Yes, we talked about that, but my question is whether the

24   four of you who were in the car had any kind of meeting about

25   what you were going to do on that shift.

J365jar2                          Maria - cross

1    A.  No.

2    Q.  So, your testimony on direct was the four of you were in a

3    car, correct?

4    A.  Yes.

5    Q.  An unmarked police car?

6    A.  Yes.

7    Q.  And you frequently go into the same neighborhood in that

8    unmarked police car, correct?

9    A.  Yes.

10   Q.  And you understand that unmarked police cars are generally

11   made by people who live in that community, correct?

12   A.  Some people make it.

13   Q.  It is made, correct?

14   A.  Some people make it.

15   Q.  Okay.

16          MR. NESSIM:  Your Honor, objection.  I don't

17   understand what the question is.

18          MS. SHROFF:  He understood it though.

19          MR. NESSIM:  For the record, what do you mean by

20   "made?"

21          THE COURT:  I think that the officer understood.

22   Objection is overruled.

23   BY MS. SHROFF:

24   Q.  Now, you made several stops before you came to the arrest

25   of Mr. Jarvis, correct?

J365jar2                        Maria - cross

1   A.  Yes.

2   Q.  And you wrote down each of those stops in your memo book,

3   correct?

4   A.  Yes.

5   Q.  And, do you recall the stops as you sit here today?

6   A.  I recall we were -- we made one arrest early that night

7   but, specifically, I don't know.

8   Q.  Do you recall what time your shift started?

9   A.  2130.

10  Q.  What is your first entry?  Do you remember?

11  A.  No.  I don't recall.

12  Q.  Let me hand you your memo book in case that's going to

13  refresh your recollection and that would be Defendant's Exhibit

14  C.

15  A.  Yes.

16  Q.  Now, would you take a look, sir, do you recall your car

17  stop at 167 and Gerard?

18  A.  Yes.

19  Q.  And at what time was that?

20  A.  I'm sorry.  Are you asking me if I recall it?

21  Q.  Yes.

22  A.  I don't.

23  Q.  Does your memo book refresh your recollection about that

24  stop?

25  A.  Yes.

J365jar2                          Maria - cross

1    Q.  And, does the memo book indicate to you a notation about

2    what you saw at that scene or smelled at that scene?

3    A.  Yes.

4    Q.  And, did you make a notation of that in your notebook?

5              MR. NESSIM:  Objection, your Honor.  He said he

6    doesn't recall the stop.

7              THE COURT:  That's the purpose of a memo book, isn't

8    it?

9              MR. NESSIM:  But he said it doesn't refresh his

10   recollection of he stop.  He is reading from the memo book.  If

11   I understand his answer.

12             THE COURT:  The objection is overruled.

13   BY MS. SHROFF:

14   Q.  You know the importance of a memo book, correct?

15   A.  Yes.

16   Q.  It is to make contemporaneous notes, correct?

17   A.  I'm sorry?

18   Q.  It is to make contemporaneous notes, correct?

19   A.  I'm not sure of the word you used.  Make what type of

20   notes?

21             THE COURT:  You are supposed to make them at the time

22   the incident occurred, at or about the time of the incident.

23             THE WITNESS:  At the incident yes.

24   BY MS. SHROFF:

25   Q.  That's why you carry your memo book with you, correct?

J365jar2                          Maria - cross

1    A.  Yes.

2    Q.  And you know that your memo book could be used in a

3    criminal case, correct?

4    A.  Yes.

5    Q.  It could refresh your recollection when testifying,

6    correct?

7    A.  Yes.

8    Q.  And it helps you recall, does it not, that at 2240 you

9    smelled marijuana at that scene, correct?

10   A.  Correct.  Unless, like I said, I don't specifically

11   remember this car stop.  I have here in my notes from the car

12   stop so I can tell you what happened based on those notes, but

13   it wasn't a very memorable car stop, clearly, because I don't

14   see myself there right now.

15   Q.  Thank you for that clarification.  My only question was

16   your memo book reflects that you smelled marijuana at that

17   stop, correct?

18   A.  Yes, it does.

19   Q.  Let's move to the next one which is 2246, correct?

20   A.  Yes.

21   Q.  Do you recall that at all?

22   A.  That I do.

23   Q.  And you recall what exactly about that stop?

24   A.  We were driving down the block and this guy kept looking

25   back at us and then he stuffed something in the wheel well of a

J365jar2                          Maria - cross

1    car.

2    Q.  And you know that as being marijuana, correct?

3    A.  I know because I ran over there --

4    Q.  Sir, my only question was do you recall that as being

5    marijuana?  Yes or no.

6    A.  Marijuana was recovered from the wheel well of the car.

7    Q.  Right, and you noted that in your notebook, correct?

8    A.  Yes.

9    Q.  Let's move to the next one, shall we?  The next one has a

10   notation that there was a disorderly group, correct?

11   A.  What time do you have there?

12   Q.  2353.

13

14        THE COURT:  What time?

15   Q.  2353; correct?

16   A.  Okay.

17   Q.  Do you recall that, sir?

18   A.  No.

19   Q.  And let's move to the next stop that you have at 0010.  Do

20   you recall that stop?

21   A.  No.

22   Q.  Does that memo book refresh your recollection that it was

23   in front of 1343 Webster Avenue and you had a strong odor of

24   marijuana?

25   A.  Yes.

J365jar2                           Maria - cross

1    Q.  Okay.

2            MR. NESSIM:  The witness just said he doesn't remember

3    the stop.  Objection.

4            THE COURT:  This is in his memo book.  It is precisely

5    designed to refresh his recollection.

6            MR. NESSIM:  But he just said he doesn't remember.

7            THE COURT:  Well, okay.

8            The objection is overruled.

9    BY MS. SHROFF:

10   Q.  And then we come to this stop, correct?

11   A.  Okay.  Yes.

12   Q.  And this stop is at West 166 and Woodycrest, correct?

13   A.  At zero -- yes.

14   Q.  And you write down disorderly group observed, correct?

15   A.  Yes.

16   Q.  No indication that you observed marijuana, correct?

17   A.  Disorderly group; that's what makes them disorderly.

18   Q.  I didn't ask you that, sir.  I asked you if there is any

19   notation here that you smelled marijuana.

20   A.  No.

21   Q.  There is no notation here that you saw anybody drinking.

22   A.  No.

23   Q.  Now, you testified that you smelled marijuana, correct?

24   A.  Yes.

25   Q.  And in response to that you did what?

J365jar2                         Maria - cross

1    A.  Stepped out of the vehicle.

2    Q.  Because you smelled marijuana you stepped out of the

3    vehicle?

4    A.  Because there was a group drinking on the sidewalk and

5    smoking marijuana.

6    Q.  And at that time you were supposed to activate your body

7    camera, correct?

8    A.  At that time --

9    Q.  Yes or no.

10   A.  At that time I was not -- I didn't fully intend on taking

11   enforcement action.

12   Q.  Sir, you were stepping out of your car, correct?

13   A.  Yes.

14   Q.  You're a police officer, correct?

15   A.  Yes.

16   Q.  You were going to approach a group, correct?

17   A.  Correct.

18   Q.  You were going to tell the group what to do in your

19   authority as a police officer, correct?

20   A.  Correct.

21   Q.  You weren't going up to them as a friend, correct?

22   A.  Correct.

23   Q.  So you were going to tell a group to follow your

24   instructions as a police officer, correct?

25   A.  Correct.

J365jar2                          Maria - cross

1   Q.  And if they didn't follow your instructions your intent, as

2   you testified on direct, was either to issue a summons or

3   arrest them, correct?

4   A.  If the situation escalated, yes.

5   Q.  So, if the situation was such that they remained on the

6   corner standing there smoking marijuana, you would have done

7   nothing?

8   A.  I would have directed them to not do that, and depending on

9   their reaction to me, I would have either taken enforcement

10  action and activated my body camera or not taken enforcement

11  action.

12  Q.  So, your testimony as a police officer is that the only

13  time you activate your camera is after you have decided to

14  actually take an action?

15  A.  In this --

16  Q.  Is that your testimony?

17  A.  In this instance, yes.

18  Q.  Sir, you are trained on the body camera, correct?

19  A.  Correct.

20  Q.  You are told how to use it, correct?

21  A.  Correct.

22  Q.  You are told when to turn it on, correct?

23  A.  Correct.

24  Q.  And you are not told how to turn it on in each different

25  incident, correct?  You are given a set of rules, correct?

J365jar2                        Maria - cross

1    A.   That's not entirely correct.

2    Q.   That's not correct?

3    A.   We are told specific instances when we are to activate it

4    and when we are not.

5    Q.   Right, and you are to activate it when you are taking

6    actions as a police officer so that there is memorialization of

7    what you do, correct?

8    A.   Not in every instance.  There are some instances where you

9    don't activate it when you are still acting as a police

10   officer.

11   Q.   Really?

12   A.   Yes.

13   Q.   So, the NYPD police department trains you on when not to

14   activate it and tells you, when you are approaching a group of

15   people smoking marijuana, don't activate the camera?

16   A.   Depends on if I'm going to take enforcement action or if

17   the situation escalates.

18   Q.   When you approached that group, one guy was leaning against

19   a car according to you, correct?

20   A.   Correct.

21   Q.   Rolling a blunt according to you, correct?

22   A.   Correct.

23   Q.   He didn't move when you approached, correct?

24   A.   Correct.

25   Q.   He kept leaning, correct?

J365jar2                           Maria - cross

1    A.   Correct.

2    Q.   Kept rolling that blunt, correct?

3    A.   Correct.

4    Q.   And you approached him, correct?

5    A.   I was walking towards him.

6    Q.   Sir, yes or no:  And you approached him, correct?

7    A.   I was walking towards him, yes.

8    Q.   And you are walking towards the person breaking the law,

9    correct?

10   A.   Correct.

11   Q.   And your testimony is as an NYPD officer you are, at that

12   point, not sure you are going to take enforcement action?

13   A.   Correct.

14   Q.   That is your testimony?

15   A.   Yes.

16   Q.   So you would have had a person smoking a blunt on the

17   street just walk on away, correct?

18   A.   He was rolling the blunt.

19   Q.   Sir, yes or no.

20   A.   Can I explain it?

21   Q.   No.

22        THE COURT:  No.  You have to answer the question yes

23   or no.

24        THE WITNESS:  No.  I was not going to necessarily

25   issue him a summons.

J365jar2                    Maria - cross

1    BY MS. SHROFF:

2    Q.  Sir, the question calls for a yes or no answer.

3    A.  Can you repeat the question, please?

4    Q.  Sure.

5        You are an NYPD officer approaching a man rolling up a

6    blunt and it is your testimony that you were not going to take

7    enforcement action against that person at 1:24 in the morning?

8    Is that your testimony?

9    A.  Not necessarily.

10   Q.  Not necessarily.

11       So, your testimony is that you would have let that man

12   walk away had he just put away a blunt?  Is that your

13   testimony?

14   A.  I have that discretion.

15   Q.  I didn't ask you if you had that discretion.  My question

16   is, as an NYPD police officer, when you are approaching a group

17   of 10 to 12 people, one of whom is clearly smoking a blunt or

18   rolling a blunt, your testimony is you were not sure you were

19   going to take enforcement action.

20       Is that your testimony?

21   A.  Yes.

22   Q.  And could you tell me, sir, what is the crime area that you

23   were patrolling at that time?

24   A.  I'm sorry?

25   Q.  You testified on direct, did you not, that you were

J365jar2                          Maria - cross

1   specifically told this is a high-crime area, correct?

2   A.   Yes.

3   Q.   And you were worried about all the violence that would come

4   in that area, correct?

5   A.   Correct.

6   Q.   And you were in fact very concerned about the escalating

7   rights rates of violence in that area, correct?

8   A.   Correct.

9   Q.   And it is your testimony that, nonetheless, at 1:30 in the

10  morning, you did not think you were going to need enforcement

11  action stepping out into a group of 10 to 12 people gathered

12  there.

13          Is that your testimony?

14  A.   Correct.

15  Q.   I see.

16          By the way, when you are trained on a body camera,

17  sir, are you told that when you approach a group of 10 to 12

18  people you should turn on the camera?

19  A.   Not necessarily.  I don't necessarily have to activate the

20  video camera at that time.

21  Q.   And you didn't think it was prudent of you to activate that

22  camera at that time?  That's your testimony, correct?

23  A.   Correct.

24  Q.   And you did not think it prudent of you for you to record

25  your conversation with a man on the street who is clearly

J365jar2                          Maria - cross

1    breaking the law, correct?

2    A.   Correct.

3    Q.   And you made that determination having been substantiated

4    twice between 2016 and 2018 for failure to properly follow

5    procedures, correct?

6    A.   Correct.

7    Q.   And you were substantiated not on one incident but on two

8    incidences, correct?

9    A.   Correct.

10   Q.   And the first incident was for failure to fill out a proper

11   form, correct?

12   A.   No.   The first instance was for stopping someone.

13   Q.   Well, no.   That's not why you were written up, right?   You

14   were written up because you inappropriately stopped someone,

15   correct?

16   A.   Written up.   You mean substantiated?

17   Q.   Yes.   Complained about, substantiated.

18   A.   For stopping someone, yes.

19   Q.   No.

20        Did the CCRB chastise you for stopping someone?   Is

21   that how you process the CCRB substantiation?

22   A.   Well, the paper that I received in department mail

23   stated --

24   Q.   The paper in the department mail stated that you simply

25   stopped a person and that is why you had a CCRB complaint

J365jar2                          Maria - cross

1    substantiated?  Is that right?

2    A.   The paperwork stated substantiated, Officer Maria stopped

3    Ralph Yearde.

4    Q.   It didn't say you abused your authority?

5    A.   Yes.  That was the claim, was the abuse of authority.

6    Q.   No, no.  Wasn't that claim substantiated, sir?

7    A.   Yes.

8    Q.   You were told that you abused your authority, correct?

9            MR. NESSIM:  Your Honor, objection.  The witness

10   doesn't have foundation to comment on CCRB process how they

11   make complaints, review complaints.

12           THE COURT:  He went through the process.  He can

13   comment if he knows.  It is fair commentary.

14           THE WITNESS:  I'm sorry.  You have to repeat the

15   question, please.

16   BY MS. SHROFF:

17   Q.   Sure.

18           You were told you abused your authority, correct?

19   A.   That's what CCRB accused me of.

20   Q.   CCRB is not in the accusing business, that's the community,

21   right?  You were accused by a human being, an individual, of

22   mistreating him, correct?

23   A.   Correct.

24   Q.   Of misidentifying him based on racial features, correct?

25   A.   I don't recall if it was based on some type of racial

J365jar2                         Maria - cross

1    thing.

2    Q.  All right.  Let's help you out.  Let's see if your CCRB

3    helps you --

4            By the way, you have received two substantiated

5    complaints, sir, correct?

6    A.  Correct.

7    Q.  And in your mind, sir, is that something in your

8    professional life that would cause you concern?

9    A.  No.

10   Q.  It would not cause you concern that somebody substantiated

11   misconduct on your job?

12   A.  No.

13   Q.  It does not cause you concern that you are sitting in a

14   federal court having to relive somebody having said that you

15   mistreated them on the job as an NYPD police officer?

16   A.  It is unfortunate but it doesn't concern me.

17   Q.  It does not concern you professionally?

18   A.  No.

19   Q.  Would you take a look at the report, sir?  Let's start with

20   the first page.  Does that refresh your recollection that

21   Police Officer Maria, there was a substantiated complaint

22   against you for searching somebody's bag, a woman's bag Luz

23   Tirado.

24           Does that refresh your recollection?

25   A.  This is the first time I have seen this paperwork.

J365jar2                          Maria - cross

1    Q.  That's nice to know but my question is whether that

2    refreshes your recollection.

3    A.  Where, exactly, are you indicating?

4    Q.  Take a look at the only name that pops out under number F.

5    Police Officer Daniel Maria.  That's you, correct?

6    A.  Under F?  States an officer -- C, okay.  So C.

7    Q.  Do you also recall that you were written up as other

8    misconduct for failure to prepare a memo book entry as

9    required?

10   A.  Yes; for one of the incidents I was.

11   Q.  And you were also written up for failure to fill out a stop

12   and frisk paper, correct?

13   A.  Is that here on this page?

14   Q.  Flip the page over and I think it is there.

15   A.  Okay.  I don't see it on the other side of the page.

16            MR. NESSIM:  Objection, your Honor.  I think the

17   question is whether the witness remembers, not whether the

18   paper says it.

19            THE COURT:  Yes.  Do you remember?

20            THE WITNESS:  I don't remember that.

21   BY MS. SHROFF:

22   Q.  Officer Maria, do you recall that there were three women

23   involved in this incident?

24   A.  I recall at least two women.

25   Q.  I see.

J365jar2                          Maria - cross

1          And you recall these women and you recall testifying

2    in front of the CCRB, do you?

3    A.  Yes.

4    Q.  And, do you recall that the CCRB noted that you had no

5    recollection of exactly what you did?

6    A.  Certain instances I didn't recollect as I also don't

7    recollect them now.  The whole incident -- I don't remember

8    parts of the incident.

9          MS. SHROFF:  Your Honor, may I ask that the witness be

10   instructed to answer the question asked as opposed to the

11   question --

12         THE COURT:  I think he is doing a good job,

13   Ms. Shroff.

14         MS. SHROFF:  Thank you.

15   BY MS. SHROFF:

16   Q.  Officer Maria, do you recall that you also told the CCRB

17   investigators that you didn't recall what any of your

18   colleagues were doing during that stop?

19   A.  That's correct.

20   Q.  And you testified to them that you could not recall even

21   what your sergeant was doing, correct?

22   A.  My sergeant wasn't on scene.

23   Q.  Okay, but you recall that you could not recall any conduct

24   that any of your colleagues took during that day, correct?

25         MR. NESSIM:  Your Honor, can we clarify what

J365jar2                        Maria - cross

1   Ms. Shroff is asking about?  Which incident?

2              MS. SHROFF:  I think your witness is understanding my

3   questions.

4              MR. NESSIM:  I think you are mischaracterizing.  Which

5   stop are you talking about?

6   BY MS. SHROFF:

7   Q.  Do you understand the question, sir?

8   A.  I believe I understand the incidents you are talking about.

9   Q.  Thank you.

10             So, could you tell me, please, if you told the CCRB

11  that you recalled not what any of your colleagues did during

12  that incident?

13  A.  I told them that I walked out into the street to flag an

14  ambulance because I was concerned for the woman's health.  So,

15  I could not testify to things that I didn't see.

16  Q.  You told them that you did not recall if you placed your

17  own hands in the woman's bag, correct?

18  A.  Correct.

19  Q.  You told them that you could not recall if the police

20  officer searched any other person's bags, correct?

21  A.  Correct.

22  Q.  And you did not recall searching anybody else on the scene,

23  correct?

24  A.  Correct.

25  Q.  And you did not say that you had stepped out on any street

J365jar2                         Maria - cross

1    to the CCRB, correct?

2    A.   That's false.  I did tell them a that.

3    Q.   I see.  Let's just keep going.

4             You also testified, did you not, that you did nothing

5    wrong during this incident, correct?

6    A.   Correct.

7    Q.   And the CCRB did not believe you, correct?

8    A.   I can't testify to what they believe.

9    Q.   Really?

10            Did you ever learn tat CCRB had found Ms. Tirado to be

11   credible?

12   A.   No.

13   Q.   Did you learn that the CCRB had found Ms. Melendez to be

14   credible?

15   A.   No.

16   Q.   Well, did you draw that inference that the CCRB had found

17   them to be credible when the complaint was substantiated

18   against you?

19            MR. NESSIM:  Your Honor, objection.  Ms. Shroff is

20   characterizing the nature of CCRB investigations.

21            THE COURT:  Sustained.  Sustained.

22   BY MS. SHROFF:

23   Q.   The CCRB substantiated it Ms. Tirado's claim, correct?

24   A.   I actually don't recall which person Ms. Tirado was.

25   Q.   The person's whose bag you inappropriately searched was

J365jar2                          Maria - cross

1    Ms. Tirado?

2    A.   Now you are saying things that I don't know to be true or

3    not.

4    Q.   Take a look at page 1.

5    A.   Okay.

6    Q.   Again.

7             Section C.  Ms. Tirado, correct?

8    A.   That's not Ms. Tirado, page 1, Section C.  Okay, that's a

9    different --

10   Q.   I am only asking you about Ms. Tirado, sir.

11   A.   Okay.

12   Q.   Does that help you refresh your recollection?

13   A.   This is the first time I'm seeing this form as well.

14   Q.   Sir, when you prepared for your direct testimony here did

15   you talk with this prosecutor?

16   A.   Yes.

17   Q.   How many times?

18   A.   I would say two or three times.

19   Q.   And you spent how many hours with him, all told?

20   A.   Probably three hours.

21   Q.   During that time you didn't talk about your CCRB

22   complaints?

23   A.   Yes, we did.

24   Q.   You talked about them in detail, correct?

25   A.   We talked about them briefly.

J365jar2                        Maria - cross

1   Q.  Right; and he reviewed them with you, correct?

2   A.  We didn't review them.  We spoke about my experience.

3   Q.  You spoke about your experience.

4           Did he tell you he had the CCRB recommendation against

5   you?

6   A.  No.

7   Q.  Did you ask him if he had the CCRB recommendation against

8   you?

9   A.  No, I did not.

10  Q.  Let's talk about the second incident when you were in a

11  bodega and you said that your lieutenant asked you to follow

12  somebody out.  Okay?

13  A.  The first incident?

14  Q.  Well, you call it first but whichever way you want.

15          That was also in 2016, correct?

16  A.  Correct.

17  Q.  And that was in --

18  A.  Actually, I don't recall the specific year.

19  Q.  Well, take a look at the document.  It should tell you that

20  it was in I think September of 2016; is that right?

21          MR. NESSIM:  Which document?

22  Q.  Do you have the document before you, sir?

23  A.  Yes.  This is the document from 2016.

24  Q.  Okay, and that's --

25          THE COURT:  What document is it, for the record?

J365jar2                          Maria - cross

1                MS. SHROFF:  3501-005.

2    Q.  Do you have that in front of you?

3    A.  Yes.

4    Q.  Does that refresh your recollection, sir, that there was a

5    complaint against you by a Mr. Yearde.  Y-E-A-R-D-E?

6    A.  Yes.

7    Q.  That was in 2016?

8    A.  Yes.

9    Q.  That's not even two years ago, right?  About two years ago?

10   A.  It is more than two years ago.

11               THE COURT:  Almost three years ago.

12   Q.  '16, about three years ago?

13               THE COURT:  Three.  19 minus 16 is three.

14   A.  Yes.

15   Q.  At that time you had three complaints against you, correct?

16    By 2016 there were three complaints against you, correct?

17   A.  I couldn't tell you a specific amount.  Probably three.  I

18   don't know.

19   Q.  Out of the three two were substantiated, correct?

20   A.  Correct.

21   Q.  And on this one --

22   A.  Actually, this was the initial one so at this time this was

23   the only complaint against me, I believe.  This was, I believe,

24   my first.

25   Q.  Okay.  So, you should recall it well because it was your

J365jar2                          Maria - cross

1    first?

2    A.   I had nothing substantiated against me at this time.

3    Q.   Until September of the same year.

4    A.   This was my first substantiated CCRB, this incident we are

5    talking about.

6    Q.   So you recall it well, right?  It was your first?

7    A.   I do not recall it well.

8    Q.   Okay.

9    A.   It was years ago.

10   Q.   So, you recall that you testified for this one as well,

11   correct?

12   A.   Correct.

13   Q.   And you told them that Mr. Yearde resembled the

14   perpetrators, just that he is a black man in that age range

15   with athletic build, correct?

16   A.   No.

17   Q.   Take a look at page 5 and see if that refreshes your

18   recollection on the top paragraph.

19   A.   It states that I had testified to that but these aren't my

20   words verbatim.

21   Q.   They put them in quotes, correct?

22   A.   They put them in quotes.  I don't recall stating it

23   specifically like that.

24   Q.   But you don't recall the complaint in the first place,

25   correct?

J365jar2                          Maria - cross

1   A.  Correct.  So, specifically exactly what happened?  No, I

2   can't recall to you.

3   Q.  In fact you don't recall it according to your

4   cross-examination testimony, correct?

5   A.  That's not correct.

6           MR. NESSIM:  Your Honor, objection.  Can Ms. Shroff

7   clarify what her question is?

8   Q.  Moving forward, sir --

9           I will move along, your Honor.

10          THE COURT:  Thank you.

11  Q.  Do you recall that the CCRB investigation concluded that

12  there was no resemblance between the man you stopped and the

13  man on the video?

14          Do you recall that?

15  A.  No, I don't.

16  Q.  And, do you recall that the CCRB found your testimony to

17  not be credible?

18  A.  No.  I'm not aware of that.

19  Q.  You are not aware of that?

20  A.  No.

21  Q.  And, do you recall the CCRB noting that your explanation of

22  the similarity between the video and the person you arrested

23  was simply not credible?

24          MR. NESSIM:  Your Honor, objection.

25          This is misconstruing the document, the witness'

J365jar2                         Maria - cross

1    testimony, the CCRB's role.

2              THE COURT:  Sustained.

3              MS. SHROFF:  Your Honor, I'm going to ask then that

4    the document be entered into evidence because that's exactly

5    what the document says.

6              MR. NESSIM:  Objection.

7              THE COURT:  Sustained.

8              What's the point here, Ms. Shroff?  Because he is

9    found incredible before the CCRB he is incredible here?

10             MS. SHROFF:  Well, no.  I can certainly explain at

11   side bar, your Honor, or we can leave it for argument, but I do

12   think that the government's objection is that I am

13   mischaracterizing the CCRB investigation.

14             THE COURT:  Why don't you leave it for argument.

15             MS. SHROFF:  I'm sorry?

16             THE COURT:  I said why don't you leave it for

17   argument.  You might as well leave it for argument.

18             MS. SHROFF:  Okay.

19   BY MS. SHROFF:

20   Q.  Both of those complaints were substantiated, correct?

21   A.  The complaints that we have spoken about today?

22   Q.  Yes.

23   A.  Yes.

24   Q.  Now, getting back to the day in question, you testified,

25   did you not, that it is your knowledge that the area at 166 is

J365jar2                         Maria - cross

1   a high-crime area, correct?

2   A.   Correct.

3   Q.   And you testified that you were aware of this how?

4   A.   Quite often -- well, my first couple years in the precinct

5   I walked the foot post in that area as part of Operation

6   Impact.

7   Q.   So that's just your opinion, correct?

8   A.   No.  It was the direction of our commanding officers.

9   Q.   So, did the commanding officer tell you by what percentage

10  there was more crime in that area?

11  A.   No.

12  Q.   Did anybody in the NYPD tell you at what times of the day

13  there was higher crime?

14  A.   No.

15  Q.   Nobody told you what specifically to look for, just that it

16  is higher crime, correct?

17  A.   No; that we experience more shootings in that area.

18  Q.   You have experienced shootings in that area?

19  A.   The precinct.

20  Q.   I am asking you; if you have experienced any shootings in

21  that area.  No, right?

22  A.   On the west side of the precinct?  Yes, I have.

23  Q.   Your testimony sitting here today is that you have

24  experienced shooting in that area, correct?

25  A.   We have to be specific.  Me specifically shooting?  No.

J365jar2                          Maria - cross

1   People shot?  Yes.

2   Q.  Sir, you testified that you have knowledge that that's a

3   high-crime area, correct?

4   A.  Correct.  We have higher incidences of shootings in that

5   area.

6   Q.  That is based solely on what you have been told

7   anecdotally, correct?

8            THE COURT:  You mean did he do a study?

9   Q.  Yes; did you do a study?

10  A.  No.

11  Q.  Did the precinct ever give you a study?

12  A.  The precinct assigned us --

13  Q.  Sir, if you answer my questions --

14  A.  -- to locations --

15  Q.  Sir.

16  A.  I'm trying to answer the question.

17  Q.  My question was --

18           THE COURT:  Generals don't usually give sergeants and

19  privates the full battle plan.  They tell them to go to a

20  particular place.  I assume that is what is done here.

21           MS. SHROFF:  I understand that.

22           THE COURT:  You are contesting that this is not a

23  high-crime area?

24           MS. SHROFF:  Yes.

25           THE COURT:  Okay.  Do you want to testify to that

J365jar2                           Maria - cross

1    fact?

2              MS. SHROFF:  No, your Honor.  I'm going to ask him to

3    testify to that fact.

4    BY MS. SHROFF:

5    Q.  You received no study that says that it has higher crimes

6    than any place else, correct?

7    A.  No.  My supervisors --

8    Q.  Sir, did you receive a study?  Yes or no.

9    A.  Study?  No.

10   Q.  Right.

11             Did you receive any research write up?  Yes or no.

12   A.  No.

13   Q.  Did you get any percentages?  Yes or no.

14             MR. NESSIM:  Objection, your Honor.

15             THE COURT:  Sustained.

16   BY MS. SHROFF:

17   Q.  Now, in this high-crime area you approached 10 to 12 people

18   standing on the street, correct?

19   A.  7 to 15.

20   Q.  7 to 15 people standing on the street?

21   A.  Yes.

22   Q.  And your testimony remains that you did not think you were

23   going to take enforcement action so you did not turn on your

24   body camera, correct?

25             THE COURT:  We have been through this, haven't we?

J365jar2                         Maria - cross

1          MS. SHROFF:  That's my only question on that point,

2     your Honor.

3     Q.   Correct?

4     A.   Correct, at that time.

5     Q.   And at that time it was 1:30 in the morning, correct?

6     A.   Approximately, yes.

7     Q.   Right.

8          And you are approaching the man who is smoking the

9     blunt, correct?

10    A.   He was rolling a blunt.

11    Q.   Rolling the blunt, correct?

12    A.   Correct.

13    Q.   And as you approach him, does he walk off?

14    A.   No.

15    Q.   He stays leaning against the car, correct?

16    A.   Correct.

17    Q.   Do you give him an order?

18    A.   I didn't get the chance to speak with him at all.

19    Q.   I didn't ask you if you spoke to him, I asked you if you

20    issued an order.

21    A.   I did not speak with him.  I did not issue anything.  Words

22    did not come out of my mouth.

23    Q.   Right.

24          So, you step out of your car, correct?

25    A.   Correct.

J365jar2                          Maria - cross

1    Q.  You approach this group, correct?

2    A.  Correct.  I was approaching the group.

3    Q.  You are approaching the group, correct?

4    A.  Correct.

5    Q.  No words have come out of your mouth, correct?

6    A.  Correct.

7    Q.  You haven't said "*police officer*," correct?

8    A.  Correct.

9    Q.  You are walking towards a group of 7 to 15 people without

10   saying "*police officer*" at 1:30 in the morning, correct?

11   A.  Correct.

12   Q.  And you haven't activated that camera, correct?

13   A.  Correct.

14   Q.  And you are walking towards that group until your colleague

15   distracts you, correct?

16   A.  Correct.

17   Q.  And your testimony is that once your colleague distracts

18   you, your attention shifts, correct?

19   A.  Correct.

20   Q.  And let me ask you something.  When you are approaching the

21   group of seven to 15 people, does anyone of your four call for

22   backup?

23   A.  No.

24   Q.  Does anybody radio you are going to do a stop?

25   A.  No.

J365jar2                        Maria - cross

1    Q.  Hasn't car looped around -- your car looped around that

2    same corner once and is now coming back for the second time?

3    A.  I don't recall doing that.

4    Q.  You don't recall not doing that, right?  You don't know one

5    way or the other whether you did or did not; is that correct?

6    A.  Correct.  We were patrolling the area itself.  It is

7    possible, but I couldn't tell you specifically if we did loop

8    the block.

9    Q.  Right, and you specifically can't tell you didn't loop the

10   block, correct?  Correct?

11   A.  I suppose, yeah.

12   Q.  Right.

13          And when you looped the block or did not loop the

14   block, you didn't put that in your memo book, correct?

15   A.  I want to --

16   Q.  Yes or no.

17   A.  This is the first time I saw the group when we approached.

18   When we initially approached at approximately 1:30 in the

19   morning, that was the first time I had seen that group of

20   people.

21          MS. SHROFF:  I move to strike as non-responsive, your

22   Honor.

23          THE COURT:  Denied.

24   Q.  Sir, do you recall writing in your memo book that you

25   looped around the block?

J365jar2                          Maria - cross

1           MR. NESSIM:  Objection.  The witness says he doesn't

2    remember if he looped around the block.

3    BY MS. SHROFF:

4    Q.  In your testimony this is the first time that you see this

5    group, correct?

6           THE COURT:  That's what he said.

7    A.  Correct.

8           MS. SHROFF:  I'm sorry, your Honor?

9           THE COURT:  That's what he said.

10   Q.  And you are in the passenger seat, correct?

11   A.  I'm in the back seat.

12   Q.  Back seat.  On which side?  Do you remember?

13   A.  I don't remember.

14   Q.  You don't remember.

15          Who is sitting next to you, sir?

16   A.  Officer Cassase.

17   Q.  And the two of you are sitting in the back and who is

18   driving?

19   A.  I don't remember who was driving.

20   Q.  And the car moves past and you see 7 to 15 people, correct?

21   A.  Correct.  We slowed down on the corner and then we got out

22   of the car.

23   Q.  You slowed down because you were going to approach the

24   group, correct?

25   A.  Correct.

J365jar2                        Maria - cross

1    Q.  And you are four people in your car, correct?

2    A.  Correct.

3    Q.  7 to 15 on the street, correct?

4    A.  Correct.

5    Q.  High-crime neighborhood according to you, correct?

6    A.  Correct.

7    Q.  You don't call for backup, correct?

8    A.  Correct.

9    Q.  You don't radio or call anybody else over, right?

10   A.  Correct.

11   Q.  You get out of the car as does your -- what is his name --

12   Officer Cassase, correct?

13   A.  Correct.

14   Q.  And your focus only shifts when he starts to talk, correct?

15   A.  Correct.

16   Q.  And when he starts to talk, the first thing you see is him

17   doing what?

18   A.  I notice Mr. Jarvis walking frantically southbound.

19   Q.  That's what you testified to directly.  You noticed

20   Mr. Jarvis walking "frantically" is the word you used, correct?

21   A.  Yes.

22   Q.  You saw Mr. Jarvis on the street, correct?

23   A.  That was the moment I saw him.

24   Q.  Right.  And he was walking at a fast pace, would you say?

25   A.  Yes.

J365jar2                          Maria - cross

1    Q.  And he was not running, correct?

2    A.  Not yet.

3    Q.  I didn't ask you -- sir, when you first saw him, he was not

4    running, right?

5    A.  When I saw him, him he was not running.

6    Q.  Right.

7         Did you overhear what he said to Officer Cassase?

8    A.  No.

9    Q.  Did you hear Officer Cassase say to him, *Hey.  Police.*

10   *Stop*?

11   A.  Yes.

12   Q.  And did you hear him say, *For what?  I didn't do nothing.*

13   A.  I noticed him shaking his head no.

14   Q.  Okay.  So you notice somebody saying no to a police officer

15   to stop, correct?

16   A.  Correct.

17   Q.  Did that worry you at all?

18   A.  Yes.

19   Q.  And did that make you think you might need to take some

20   enforcement action, sir?

21   A.  Yes, which is why I stepped onto the sidewalk towards

22   Mr. Jarvis.

23   Q.  You stepped onto the sidewalk.

24   A.  Yes.

25   Q.  You didn't turn on the body camera?

J365jar2                    Maria - cross

1   A.  No.  At that point I was processing what was going on.

2   Q.  You're a police officer of how many years?

3   A.  Six years.

4   Q.  Six years.  So you know you have a process and press the

5   camera, correct?

6   A.  The body camera I had for a month.

7   Q.  Right; but you were trained on it, correct?

8   A.  Correct.

9   Q.  And you knew how to use it, correct?

10  A.  Yes.

11  Q.  Right.  And if you didn't know how to use it I'm sure you

12  could have told the NYPD, hey, before I go out tonight to this

13  high-crime neighborhood, would you re-train me, correct?

14  A.  I'm sorry.  What?

15  Q.  You have a piece of equipment, correct?

16  A.  Yes.

17  Q.  You are an NYPD officer, correct?

18  A.  Yes.

19  Q.  If you don't know how to use it you can ask, correct?

20  A.  Yes.

21  Q.  You didn't ask, correct?

22  A.  Correct.

23  Q.  Right.  You could have turned on the button, correct?  Yes

24  or no.

25  A.  I attempted to turn on the button.

J365jar2                        Maria - cross

1   Q.  No, no.  I'm not asking if you attempted to, sir.  I'm

2   asking you if, at that moment, as you testified on cross while

3   you were still processing, it is a fact that you did not turn

4   on that button, correct?

5   A.  That's not correct.

6   Q.  In fact, sir, you did not turn on that button well after

7   Mr. Jarvis was arrested, correct?

8   A.  That's not correct.

9   Q.  Let me remind you that you spoke to this prosecutor on May

10  24th, 2018, correct?

11  A.  Maybe.

12  Q.  I'm sorry?

13  A.  I don't recall the exact date I spoke with him.

14  Q.  Well, let's see if we can help you out.  Let me show you

15  3501-001.  You went for an interview, correct?

16  A.  Correct.

17  Q.  May 24th, 2018?  Does that document refresh your

18  recollection?

19  A.  This is -- I don't know.  I have never seen these notes

20  before.

21  Q.  It doesn't matter.  Just take a look at the front page, top

22  left column, first line.

23  A.  Okay.

24  Q.  Does it refresh your recollection that you met with the

25  prosecutor on May 24, 2018?

J365jar2                          Maria - cross

1    A.  Yes.

2    Q.  You are P.O. Maria?

3    A.  Maria, yes.

4    Q.  Maria, yes.

5            In that interview, right -- are you there?

6    A.  Yes you.

7    Q.  Told this prosecutor that you did not activate the camera

8    until after the gun was recovered, correct?

9    A.  It says the button flew off and tried to activate it after

10   I recovered the gun.

11   Q.  Right.  That's what you told the prosecutor on May 24,

12   2018, correct?

13   A.  Correct, but that's not when the button --

14   Q.  Sir, I didn't ask you anything more.

15   A.  All right.

16   Q.  Isn't that what it says?

17   A.  That's what it says.

18   Q.  By the way, when you were done with your shift and you

19   talked about the camera not working, correct?

20           You reported the camera not working correctly, right?

21   A.  Yes, I did.

22   Q.  You did not know what time it failed to record, correct?

23   A.  I did, because it was the time of the arrest.

24   Q.  No, no.  I'm asking you if you reported the time that it

25   failed to work.  You simply said it didn't work on the shift,

J365jar2                         Maria - cross

1   correct?

2   A.  Correct.

3   Q.  Right.  You didn't make any specific notation as to when it

4   didn't work, correct?

5           THE COURT:  She is asking you did you tell when you

6   made your report that the camera wasn't working?  Did you say

7   it didn't work at 1:06 at the corner of the Woodycrest and 166

8   as you were making an arrest?

9           THE WITNESS:  You would tell your supervisor, but my

10  supervisor was there so he knew.

11  BY MS. SHROFF:

12  Q.  Did you make any contemporaneous notes as to when you

13  activated the camera?

14  A.  We don't notate when we activate cameras in our brook.

15  Q.  You don't notate when a camera fails to properly work?

16  A.  No, we do.

17  Q.  Okay.  So, it failed to properly work, correct?

18  A.  Correct.

19  Q.  And you did not write down the time at which it failed to

20  properly work, correct?

21  A.  You would have your supervisor --

22  Q.  Sir, did you write it down anywhere?

23  A.  What?

24  Q.  Did you write it down anywhere?

25  A.  I wrote down the ticket number in my book.

J365jar2                        Maria - cross

Q.   Right.   Other than the ticket number, which is not what you

would ever testify to in a criminal case, you did not write

down at what time it failed to work, correct?

A.   I wouldn't be required to do that if my sergeant was aware

of it.   My sergeant would sign my book if my camera failed

outside of his presence.

Q.   So, the NYPD's rule is if a camera fails to record, the

only time you need to make a note is if your sergeant is

physically not present during the failure, correct?

A.   No.   The sergeant makes a note in your book.

Q.   Sir, it's a simple question whether the NYPD requires it or

not.   Did you make a note?

A.   No.

Q.   Okay.

          Now you testified, did you not, that you saw your

Officer Cassase approach Mr. Jarvis, right?

A.   Officer Cassase, yes.

Q.   And you saw Officer Cassase approach Mr. Jarvis and

Mr. Jarvis shake his head no, correct?

A.   Correct.

Q.   And it is correct to say Officer Cassase never told

Mr. Jarvis, in your presence, why he wanted him to stop,

correct?

A.   In that moment?   No.

Q.   I'm only talking about that moment, sir.

J365jar2                         Maria - cross

1    A.   No.

2    Q.   Okay.

3            And, you know, as a police officer, that if a person

4    doesn't want to stop they don't have to, correct?

5    A.   That's not true.

6    Q.   Okay.

7            So, your opinion is if a police officer tells you to

8    stop you have to stop.  That's your position?

9    A.   My position is that you can't make it -- that's not a yes

10   or no question.

11   Q.   So, when Mr. Jarvis asked Officer Cassase why he should

12   stop, did you hear him ask that question?

13   A.   No.

14   Q.   Did you hear Officer Cassase answer him at all?

15   A.   No.

16   Q.   The next thing you know is Officer Cassase is on top of

17   Mr. Jarvis, correct?

18   A.   No.  Officer Cassase was following him, telling him to

19   stop.  He was shaking his head no, then he began running.

20   Q.   And how long did he run for, according to you?

21   A.   Approximately 10 to 15 feet.  Not far.

22   Q.   That would be what?  One or two seconds?

23   A.   I don't know.

24   Q.   You don't know?

25   A.   He ran for 10 or 15 feet.

J365jar2                         Maria - cross

1   Q.  He ran for 10 or 15 feet, correct?

2   A.  Correct.

3   Q.  And then Officer Cassase jumped on Mr. Jarvis, correct?

4   A.  He tackled him, yes.

5   Q.  When you tackle somebody you have to jump on them, correct?

6   A.  Jumped on top of him, tackled him, grabbed hold of him, and

7   pulled him to the ground.

8   Q.  How?

9   A.  From behind, grabbed him.

10  Q.  How?

11  A.  I don't know exactly how.

12  Q.  You don't remember how he tackled him?

13  A.  He tackled him like you would tackle a person.  I don't

14  know.

15  Q.  Well, did you see Officer Cassase put his hand around

16  Mr. Jarvis?

17  A.  Yes.

18  Q.  Did you see him push his two arms in, tackle him, and both

19  fall to the ground, correct?

20  A.  I don't remember specifically how he was tackled.  I

21  remember he was pulled to the ground, Officer Cassase was

22  behind him, and Officer Cassase came down on top of him.

23  Q.  It would help if that body camera was on, correct?

24  A.  Sure.

25  Q.  Right.

J365jar2                        Maria - cross

1          So, now you at least have acknowledged that he has his

2    arms -- Cassase's -- around Mr. Jarvis and pulls him down,

3    correct?

4    A.  I don't remember if both his arms were around him.

5    Q.  Really?  You don't remember now, suddenly, that both his

6    arms were around him?

7    A.  I just know that he tackled him.  That's what I remember.

8    Q.  I see.

9          And you have no doubt in your mind, right, that

10   Mr. Jarvis is in front and Cassase is on the back, correct?

11   A.  Correct.

12   Q.  And now Jarvis is below Cassase on the floor, correct?

13          THE COURT:  On the street.

14   Q.  Yes, on the street, your Honor.  Thank you.

15   A.  I don't know what you mean by directly on top of each other

16   but Officer Cassase pulled him to the ground.

17   Q.  Right.  So one person is -- well, Jarvis is certainly not

18   on top of Cassase, right?

19   A.  Correct.

20   Q.  Right.

21          So, it's Jarvis on the floor face down, right?

22   A.  Correct.

23   Q.  Right; and he is face down hands in, correct?

24   A.  I didn't see both his hands.

25   Q.  You didn't see both his hands?

J365jar2                        Maria - cross

1    A.  No; just his right hand.

2    Q.  I see.

3            So you are approaching an officer who is on top of

4    Mr. Jarvis, correct?

5    A.  Correct.

6    Q.  Right.

7            And at the point that you approach, isn't the officer

8    on top of Mr. Jarvis still when you approach?

9    A.  Not completely.

10   Q.  Right, but he is partially still on top of him, correct?

11   A.  Correct.

12   Q.  And you are almost what, a whole minute behind?

13   A.  A minute?  No.

14   Q.  No?

15   A.  I'm right behind him.

16   Q.  You are right behind him?

17   A.  Yes.

18   Q.  Right.  So that means you are right behind him yet you

19   never see Cassase completely on top of Jarvis.  That's your

20   testimony?

21   A.  This is confusing.  I'm not sure.

22   Q.  You don't remember?  You can say you don't remember if you

23   don't know.

24           MR. NESSIM:  Objection.  What does Ms. Shroff mean by

25   completely on top of?

J365jar2                          Maria - cross

1          MS. SHROFF:  I'm not asking you questions.

2    BY MS. SHROFF:

3    Q.  Do you remember, sir?

4    A.  Was Mr. Jarvis, did he completely disappear underneath

5    Officer Cassase?  No --

6    Q.  That's not what I asked you.

7    A.  -- so I don't understand what your question is.

8    Q.  Okay.  Let's try this.

9          You see the police officer on top of Mr. Jarvis,

10   correct?

11   A.  See him tackle Mr. Jarvis, yes.

12   Q.  And then you see the tackle face down on Mr. Jarvis,

13   correct?

14   A.  Correct.

15   Q.  And, according to your testimony, you don't know where his

16   left hand is, right?

17   A.  Correct.

18   Q.  You don't know where his left arm is, correct?

19   A.  When Officer Cassase was on top of his left side I moved to

20   the right side because that was the open area.

21   Q.  Okay.  So, now you remember that the right side was the

22   open area, correct?

23   A.  That was where there was room.  They were between two

24   parked cars, so.

25   Q.  Right.  So, you moved to the right side, correct?

J365jar2                          Maria - cross

1    A.   I approached them on the right side.

2    Q.   And by then how many other police officers are right where

3    the two of them are?

4    A.   I wasn't focused on that.

5    Q.   Well, you are four people, right?

6    A.   Correct.

7    Q.   You know where Cassase is, correct?

8    A.   Officer Cassase is to the left of Jarvis at this time.

9    Q.   Right.  And you know where you are to the right, correct?

10   A.   Correct.

11   Q.   And your testimony is that you don't know where the other

12   two police officers are, correct?

13   A.   Correct.  When I approached, yes, I don't remember where

14   they are.  Right.

15   Q.   And when approach, he is not -- by he I mean Mr. Jarvis --

16   is clearly not able to move, correct?

17   A.   He is moving.

18   Q.   Is he able to get up and leave?

19   A.   No.

20   Q.   Is he stopped?

21   A.   Yes.

22   Q.   Face down?

23   A.   Yes.

24   Q.   And Officer Cassase is cuffing him, correct?

25   A.   No.  He struggled to get control of his arms.

J365jar2                        Maria - cross

1    Q.  Right.

2    A.  And his right arm was underneath his body.

3    Q.  You said that a thousand times.

4            My question is Officer Cassase is trying to cuff

5    Mr. Jarvis, correct?

6    A.  At what time?  Are we talking about --

7    Q.  When you approach Officer Cassase his goal to cuff

8    Mr. Jarvis, correct?

9    A.  I can't tell you what his goal is at that time.  They're

10   trying to gain control of his arms.

11   Q.  Right; but officer Cassase has his cuffs out, right?

12   A.  That's not correct?

13   Q.  That's not correct?

14   A.  No.

15   Q.  You recall that at that point Officer Cassase does not have

16   his cuffs out.  That you can recall?

17   A.  I can tell you the handcuffs that cuffed Jarvis were not

18   Officer Cassase's.

19   Q.  Okay.  You do recall, though, that Mr. Jarvis' left arm is

20   not free to move anymore, correct?

21   A.  I don't know what is going on with the left side of his

22   body.  I am focused on his arm underneath his body.  That's

23   what I'm focused on.

24   Q.  Okay.  Let's stay where you are focused on.

25            His arm, according to you, is underneath his body; his

J365jar2                              Maria - cross

1    right arm, correct?

2    A.   Yes.

3    Q.   Your police officer is on the left side, correct?

4    A.   Correct.

5    Q.   You testified that there is no way Jarvis is going to be

6    able to get up and leave, correct?

7    A.   Correct.

8    Q.   He was under arrest as far as you were concerned, correct?

9    A.   That's not correct.  He was being stopped at this time.

10   Q.   He is being stopped.

11           So if he got up and said, "Please, am I free to

12   leave?" you would have said yes?

13   A.   No.

14   Q.   So he wasn't free to leave, correct?

15   A.   Correct.

16   Q.   So, if he is not free to leave he is under arrest, correct?

17           MR. NESSIM:   Objection.

18           THE COURT:   Sustained.

19   Q.   He is not free to leave, correct?

20   A.   Correct.

21   Q.   And your officer is literally right next to you, your

22   colleague, correct?

23   A.   Correct.

24   Q.   And your testimony is you put your hand underneath

25   Mr. Jarvis' moving body on the right side, correct?

J365jar2                         Maria - cross

1    A.  Correct.

2    Q.  And you put your hand there because you believed there is a

3    gun, correct?

4    A.  Correct.

5    Q.  And you do that as a police officer, correct?

6    A.  Correct.

7    Q.  And by that time it is an enforcement action, correct?

8    A.  Correct.

9    Q.  And you still don't turn on your camera, correct?

10   A.  By that time I was already --

11   Q.  Sir, yes or no.

12          THE COURT:  He was busy at the time.

13   Q.  Sir, yes or no, do you activate your camera?  Yes or no.

14   A.  My camera is not activated at time.

15   Q.  Okay.  You did not activate it, correct?

16   A.  Correct.

17   Q.  Okay.  And you think that Mr. Jarvis has a gun, correct?

18   A.  Correct.

19   Q.  And you don't cuff him first, correct, on the left side?

20   A.  I'm sorry?

21   Q.  Nobody cuffs his left hand and arm according to you, still,

22   correct?

23   A.  Correct.

24   Q.  So you have a man with a gun, nobody is cuffing his left

25   hand according to you, correct?

J365jar2                        Maria - cross

1    A.  He is restrained in -- they're attempting to restrain him

2    at this time.

3    Q.  And there comes a point where his left arm is restrained

4    correct?

5    A.  Yes.

6    Q.  Right.

7            And, nevertheless, you go into his pants from the

8    right side while he is face down on the floor to retract a gun,

9    correct?

10   A.  I reached for his hand that's concealed underneath his body

11   and I feel a firearm.

12   Q.  Sir, you reach for the gun because you think he has a gun,

13   correct?

14   A.  Correct.

15   Q.  Right.  So you reach for the gun, right?

16   A.  Correct.

17   Q.  Okay.  And you reach for the gun while is he face down,

18   correct?

19   A.  Correct.

20   Q.  Now, do you by any chance remember where the gun was?

21   A.  It was in the right side of his waistband.

22   Q.  Waistband of what?

23   A.  Of his jeans.

24   Q.  Of his jeans.

25           Your testimony is that Mr. Jarvis had a firearm in the

J365jar2                         Maria - cross

1   waistband of his jeans?

2   A.   Correct.

3   Q.   Did you process or play any role in Mr. Jarvis' processing

4   at the precinct?

5   A.   No.

6   Q.   Did you watch when he was being videotaped by your

7   colleague Officer Cassase?

8   A.   No.

9   Q.   Did you know how many pieces of clothing Mr. Jarvis was

10  wearing?

11  A.   No.

12  Q.   Did you know that he was wearing a pair of boxer shorts?

13           MR. NESSIM:   He just said -- objection.

14           MS. SHROFF:   I am allowed to ask, your Honor.  He can

15  answer no.

16           THE COURT:   Objection is overruled.

17  BY MS. SHROFF:

18  Q.   Do you know if he was wearing a pair of boxer shorts?

19  A.   I don't recall specific layers.  I didn't see specific

20  layers on him.  I saw the jeans.

21  Q.   Did you see, after the boxer shorts, he was wearing a pair

22  of Nike pro leggings?

23  A.   I didn't undress him.  I didn't see him.  After that I

24  didn't -- I didn't know what he was wearing.  He had his top

25  layer was jeans.  That's what I was aware of.

J365jar2                        Maria - cross

1    Q.   You watched the videotapes on this case, correct?

2    A.   Which videotapes do you mean?

3    Q.   The cameras.  The body camera recordings, correct?

4    A.   Yes.

5    Q.   You watched the evidence in this case, correct?

6    A.   The what?

7    Q.   Why do you keep looking at him when are you answering me?

8    A.   The evidence?

9    Q.   Right.

10   A.   I have looked at evidence in this case, yes.

11   Q.   And you see him, do you not -- Mr. Jarvis -- wearing a pair

12   of Nike Pro underwear, right?

13   A.   I -- I don't know.

14   Q.   You don't know?

15   A.   I don't remember him wearing pro underwear.

16   Q.   Okay.

17   A.   I don't recall his underwear.

18   Q.   So, you don't recall the boxer shorts, you don't recall the

19   underwear, but you recall the black jeans, correct?

20   A.   I remember him wearing jeans, yes.

21   Q.   Right.  Do you recall him having a belt?

22   A.   I believe he was wearing a belt.

23   Q.   Right.  He was wearing a belt, correct?

24   A.   Yes.

25   Q.   And you played no role in vouchering any of it, correct?

J365jar2                         Maria - cross

1    A.  Correct.

2    Q.  And after you took him to the precinct, did you play any

3    other role in this case?

4    A.  No.

5    Q.  Do you know if he, when he went to the state criminal

6    court, did you speak to the district attorney's office?

7    A.  Bronx criminal court?

8    Q.  Whatever state court, sure, Bronx.

9            THE COURT:  Did you talk to the Bronx District

10   Attorney?

11           THE WITNESS:  I don't recall if I spoke to the Bronx

12   District Attorney about this.

13   BY MS. SHROFF:

14   Q.  Who was the arresting officer in this case?

15   A.  Officer Cassase.

16   Q.  And, do you know if Officer Cassase vouchered any of

17   Mr. Jarvis' clothing?

18   A.  I don't know what he vouchered.

19   Q.  You don't know what he vouchered?

20   A.  No.

21   Q.  And you have been an NYPD officer for how many years?

22           THE COURT:  Six.

23   A.  Six.

24   Q.  And, in having been a police officer who has done -- did

25   you say about 25 gun seizures, is that what you said you have

J365jar2                         Maria - cross

1   done?

2   A.  Correct.

3   Q.  Right.  And you have testified before, correct?

4   A.  I testified once in juvenile court.

5   Q.  And you know it is important to voucher evidence, correct?

6   A.  Correct.

7   Q.  And, as far as you know, you never vouchered any of the

8   clothes Mr. Jarvis was wearing that night, correct?

9   A.  I did not voucher anything.

10  Q.  Now, let me just ask you a couple more questions about 166

11  and where you made the stop, correct?  You approached the 7 to

12  15 people, right?

13  A.  On 166 Street and Woodycrest Avenue.

14  Q.  Right.  And after Mr. Jarvis wads arrested, you played no

15  role in what happened to him, correct?

16  A.  Correct.

17  Q.  Did you remain at the scene?

18  A.  No.

19  Q.  Did you leave?

20  A.  Yes.

21  Q.  Before you left, did you take any pictures at all of any

22  blunts around that area?

23  A.  No.

24  Q.  Did you take any pictures of any alcohol around that area?

25  A.  No.

J365jar2                     Maria - cross

1   Q.   Did you take pictures of any cups around that area?

2   A.   No.

3   Q.   Did you call for anybody to come and take photos of the

4   crime scene?

5   A.   No.

6   Q.   Did you call for any back up to take or voucher any of the

7   physical evidence that was there?

8   A.   No.

9   Q.   So you vouchered not a single piece of evidence that would

10  substantiate your claim that people were drinking or smoking at

11  that scene, correct?

12  A.   Correct.

13  Q.   They do tell to you voucher evidence when you train as an

14  NYPD officer, right?

15          MR. NESSIM:   Objection.   Relevance.

16          THE COURT:   Sustained.

17  BY MS. SHROFF:

18  Q.   Now, you were sitting in the back seat of the car, correct?

19  A.   Correct.

20  Q.   And when the car stopped, your focus was not on Mr. Jarvis;

21  is that your testimony?

22  A.   Yes.

23  Q.   So, according to you, you never saw Mr. Jarvis adjust

24  anything at all, correct?

25  A.   I didn't notice Mr. Jarvis until he was walking down the

J365jar2                    Maria - redirect

1    street.

2    Q.  So, the answer would be no?

3    A.  Yes.  The answer would be no.

4            MS. SHROFF:  Your Honor, may I just have a minute?

5            THE COURT:  Yes.

6            MS. SHROFF:  Thank you.

7            (Counsel conferring)

8    BY MS. SHROFF:

9    Q.  Sitting here today, sir, as the car is approaching the

10   group of 7 to 15 people, you recall no conversation other than

11   what you have testified to already, correct?

12   A.  Correct.

13           MS. SHROFF:  Thank you.  I have nothing further.

14           MR. NESSIM:  Brief redirect, your Honor?

15           THE COURT:  Yes.

16   REDIRECT EXAMINATION

17   BY MR. NESSIM:

18   Q.  Officer Cassase, Ms. Shroff asked you some questions --

19           THE COURT:  This is Officer Maria.

20   Q.  I'm sorry, Officer Maria.  Excuse me.  My apologies.

21           Ms. Shroff asked you some questions about your memo

22   book entries.  Do you remember those?

23   A.  Yes.

24   Q.  And she said that your memo book included a reference to a

25   disorderly group at the time of Mr. Jarvis' arrest?

J365jar2                          Maria - redirect

1   A.   Yes.

2   Q.   What do you understand a disorderly group to mean?

3   A.   A disorderly group is a group of people, or I understand at

4   least three people or more that are on a public sidewalk, are

5   in public, committing some kind of violation.

6   Q.   And, what do you remember as the most important aspect of

7   the arrest of Mr. Jarvis?  What fact is most important to you?

8              MS. SHROFF:  Objection.

9              THE COURT:  Overruled.

10             THE WITNESS:  The fact that he possessed a firearm.

11  BY MR. NESSIM:

12  Q.   Did you record that in your memo book?

13  A.   Yes, I did.

14  Q.   When a disorderly group -- could a disorderly group be

15  smoking marijuana?

16             MS. SHROFF:  Objection your Honor.

17  A.   Yes.

18             THE COURT:  Overruled.

19             It could be, yes.  Anything is possible.

20  BY MR. NESSIM:

21  Q.   There were some questions about it being a high-crime area,

22  the area of the stop?

23  A.   Yes.

24  Q.   When you are in a high-crime area, how do you approach each

25  incident with individuals there?

J365jar2                         Maria - redirect

1    A.  I approach people with respect.  Sometimes a group of

2    people and often times, especially on the west side of our

3    precinct, honestly, in most areas of our precinct people will

4    commit minor violations.  We will approach them and if they're

5    respectful, we don't necessarily have to issue them a summons

6    for it.  It could be something you maybe warn and admonish.  A

7    lot of my stops are of that fact, warn and admonish situations.

8    Q.  Do you view rolling a blunt as a violent crime?

9    A.  Unlawful possession of marijuana is a violation and could

10   be easily admonished, especially if that person is respectful

11   and we come to an understanding that they can't do that on the

12   sidewalk.

13   Q.  There were some questions about your body camera.

14   A.  Yes.

15   Q.  There were some notes you were shown; do you remember

16   those?

17   A.  Yes.

18   Q.  Notes of our May 24th interview?

19   A.  Yes.

20   Q.  Have you ever seen those notes before?

21   A.  No.

22   Q.  Did you take those notes?

23   A.  No.

24   Q.  Did you try to activate your body camera during this

25   incident with Mr. Jarvis?

J365jar2                        Maria - redirect

1    A.   I did.

2    Q.   When did you try to activate it?

3    A.   At some point during the run after.  While I was running

4    after him, I attempted to, as I ran approaching them on the

5    ground I attempted to snap the camera on.

6    Q.   And why did you attempt to activate your camera?

7    A.   Because it has now escalated to an enforcement situation.

8    Q.   How long would you characterize the time period is from

9    when you first see Mr. Jarvis to when you see Officer Cassase

10   tackle him?

11   A.   Seconds.

12   Q.   More than 10 seconds?  Or less?

13            MS. SHROFF:  Objection.

14            THE COURT:  Overruled.

15            THE WITNESS:  Less.

16   BY MR. NESSIM:

17   Q.   Ms. Shroff mentioned that you were focused on the man

18   rolling the blunt until your colleague distracted you.

19   A.   Yes.

20   Q.   Just to be clear, what distracted you?

21   A.   He was calling out in like more of a command voice tone to

22   Mr. Jarvis and Mr. Jarvis was frantically walking.  So, I heard

23   Officer Cassase call out, I looked up in that direction, and

24   quickly behind Mr. Jarvis is Officer Cassase walking.

25   Mr. Jarvis is walking frantically so I, from that I determined

J365jar2                         Maria - redirect

1    that he was attempting to stop Mr. Jarvis.

2    Q.  And what did Mr. Jarvis do next?

3    A.  Actually continued to walk and then he quickly changed

4    direction and started to sprint westbound, tried to cross the

5    street.

6    Q.  You mentioned during cross that Mr. Jarvis shook his head

7    and Ms. Shroff asked you if Officer Cassase ever said anything

8    to Mr. Jarvis about why he was stopping him.

9         Do you remember those questions?

10   A.  Yes.

11   Q.  Why didn't Officer Cassase answer the questions?

12        MS. SHROFF:  Your Honor, how would he know why Officer

13   Cassase did something?  Objection.

14        THE COURT:  The objection is overruled.

15   A.  In a situation like that we normally.

16        MS. SHROFF:  Objection.

17        THE COURT:  You have already objected.  It has been

18   overruled.

19   A.  Normally, if someone is trying to evade you, you don't have

20   time to have a back and forth conversation with them while

21   they're trying to run away from you, so.

22   Q.  What did Mr. Jarvis did next in this situation?

23   A.  He ran away from us.

24        MR. NESSIM:  One moment, your Honor?

25        THE COURT:  Yes.

J365jar2                          Maria - redirect

1              MR. NESSIM:  Thank you.

2              (Counsel conferring)

3    BY MR. NESSIM:

4    Q.  In the body camera footage we saw earlier you mentioned you

5    were motioning to him?

6    A.  Yes.

7    Q.  What were you doing then?

8    A.  I noticed that the camera was blinking red, which indicated

9    to me that it wasn't capturing any footage and that the square

10   that I slide down to activate the camera magnetically or

11   whatever, however it works had popped off, was missing.

12   Q.  You mentioned turning to the ITB for technical help.

13   A.  Yes.

14   Q.  Did you make any notation of that?

15   A.   It is in my memo book.  I wrote down making an ITB ticket

16   number, which is basically a serial number for your phone call.

17   Q.  Where in your memo book did you put this?

18   A.  I have it right the fly page.

19   Q.  On the page relating to this arrest incident?

20   A.  Yes.

21   Q.  There were some questions about Mr. Jarvis being on the

22   ground and Officer Cassase being on top of him and you reaching

23   underneath?

24   A.  Yes.

25   Q.  Why were you reaching underneath Mr. Jarvis?

J365jar2                        Maria - redirect

1   A.  It was my concern that his hand, that he was holding a

2   weapon in his waist and he was reaching for it and I was

3   worried about the safety of everyone.

4   Q.  Would it have been possible to handcuff Mr. Jarvis while

5   his right arm was underneath him?

6   A.  No.

7   Q.  What did you do when you reached underneath him?

8   A.  When I reached underneath him I attempted to get ahold of

9   his wrist and hand.  When I grabbed onto his hand I felt on his

10  jeans there was a hard object in his jeans that felt like the

11  handle of a firearm.  When I grabbed ahold of his hand I closed

12  my hand a little bit more on his fingers and further felt the

13  handle of the firearm.  I let my colleagues know there was a

14  gun.

15  Q.  Then what happened?

16  A.  Then, eventually, my colleagues were pulling on his arms to

17  pull them behind his back; I also pulled on his arms, was

18  eventually able to get his hand out from underneath his body.

19  They grabbed ahold of that arm and secured it while I reached

20  back underneath again to recover the gun.

21  Q.  And, did you recover a gun?

22  A.  Yes, I did.

23          MR. NESSIM:  Nothing further, your Honor.

24          MS. SHROFF:  May I, your Honor?

25          THE COURT:  Very briefly, Ms. Shroff.

J365jar2                          Maria - recross

1    RECROSS EXAMINATION

2    BY MS. SHROFF:

3    Q.   You wrote down "observed disorderly group," correct?

4    A.   Correct.

5    Q.   You didn't write down "smelled marijuana," correct?

6    A.   Correct.

7    Q.   Didn't write "down strong odor of marijuana," correct?

8    A.   Correct.

9    Q.   And a strong odor of marijuana would not necessarily be

10   part of disorderly conduct, correct?

11   A.   I don't understand what you are saying.

12   Q.   You could be disorderly without having a strong marijuana

13   smell, correct?

14   A.   Correct.

15   Q.   Right.  And you didn't write down strong marijuana smell,

16   correct?

17   A.   Correct.

18   Q.   Now, you testified that you were worried about the gun for

19   safety reasons, correct?

20   A.   Correct.

21   Q.   You had an officer on top or at least on the left side top

22   of Mr. Jarvis, correct?

23   A.   Correct.

24   Q.   You had three other police officers, correct?

25   A.   Correct.

J365jar2                        Maria - recross

1   Q.  Not one police officer stood up Mr. Jarvis, correct?

2   A.  Correct.

3   Q.  And when you recovered the gun, sir, wasn't the safety on?

4   A.  I recovered the gun and I handed it over to Officer

5   Cassase.  The status of the safety, I have no idea.

6   Q.  You recovered a gun and you didn't check if the safety was

7   on?  You were so worried about your safety, though.

8   A.  Sorry.  We are talking about the safety on a firearm?  Or

9   my personal safety?

10  Q.  No, no.  I'm talking about the safety on the gun, sir.

11  A.  Okay.

12  Q.  Did you check to see if the safety on the gun was on?

13          Why do you keep looking at this prosecutor when I'm

14  asking you questions?

15  A.  Because I'm expecting him to object.

16  Q.  Well, you should try and keep your eyes on me so you can

17  answer my question, sir.

18  A.  I am listening to you.

19  Q.  Great.

20          So, tell us, sir, when you recovered this very

21  dangerous firearm, did you check to see if the safety was on?

22  A.  No.

23  Q.  Now, you testified, sir --

24          THE COURT:  Did you check to see if it was loaded?

25          THE WITNESS:  No, he does that at the precinct.

J365jar2                         Maria – recross

1              THE COURT:  Was it in fact loaded?

2              THE WITNESS:  What is that?

3              THE COURT:  Was it loaded?

4              THE WITNESS:  Yes.  I learned later it was loaded.

5    BY MS. SHROFF:

6    Q.  When you testified to your camera that you are doing this

7    and you see a red light, correct?

8    A.  Correct.

9    Q.  That's only based on what you are reciting of what you see

10   on the video, correct?

11             Sir, yes or no.

12   A.  The button was missing on my camera.

13   Q.  That is that's not what I asked you.

14             Is there anything on that video standing alone other

15   than your testimony, that would corroborate what you are saying

16   here today?

17   A.  I would have to take another look at the video.

18   Q.  Really?

19   A.  Yes, really.

20   Q.  Okay.  Let's show it to him.

21             THE COURT:  No.  We are not going do that.  This is

22   recross and it is discretionary.  Do you have a few more

23   questions?

24             MS. SHROFF:  Yes, your Honor; I do.

25             THE COURT:  Okay.

J365jar2                        Maria - recross

1  BY MS. SHROFF:

2  Q.  You did not recite, at any point on the video, that my

3  camera is failing, correct?  No or yes is the answer.

4  A.  I am speaking to my sergeant about that on the video.

5  Q.  Sir, do you say the camera is not working?  Yes or no.

6  A.  I recall saying something about the camera but you have to

7  watch the video again to determine exactly what I said.

8  Q.  Do you recall --

9          THE COURT:  Three more questions, Ms. Shroff.

10          MS. SHROFF:  Okay, your Honor.  Thank you.

11          THE COURT:  I mean, you are trespassing on patience

12  here.

13          MS. SHROFF:  Okay.  Actually, let me see if I have

14  three more questions, your Honor.

15          THE COURT:  Okay, good.

16  BY MS. SHROFF:

17  Q.  You were asked on redirect about whether or not Officer

18  Cassase had time to answer Mr. Jarvis, correct?  Right?

19  A.  I believe I was asked about whether or not we would answer

20  at time, yeah.  Correct.

21  Q.  So, if a defendant or a person asked you why they're asked

22  they're being stopped, the NYPD does not have to answer, sir?

23  A.  Not while I'm running away.

24  Q.  At that time Mr. Jarvis wasn't running away, correct?

25  A.  He was walking very quickly.

J365jar2

1    Q.  Right; but he wasn't running away, correct?

2    A.  But he also wasn't free to leave.

3            MS. SHROFF:  Okay.  He wasn't free to leave by then.

4    Thank you very much.  Nothing further.

5            THE COURT:  Before you go, Officer Maria:  You are in

6    the back seat of the car with Officer Cassase; is that correct?

7            THE WITNESS:  Yes.

8            THE COURT:  You don't know which seat you are

9    occupying in the back seat?

10           THE WITNESS:  I don't recall which seat, no.

11           THE COURT:  And, did Officer Cassase say anything

12   about his observation of Mr. Jarvis about adjusting his

13   waistband?

14           THE WITNESS:  In the car?  No.

15           THE COURT:  In the car before he got out?

16           THE WITNESS:  No.

17           THE COURT:  He didn't say he is likely to have a gun?

18           THE WITNESS:  No.

19           THE COURT:  You are excused.  Thank you.

20           (Witness excused)

21           THE COURT:  Do you have more witnesses?

22           MR. NESSIM:  No, your Honor.

23           THE COURT:  What do you want do then?

24           MR. MARCUS AMELKIN:  What's that, your Honor?

25           MR. NESSIM:  We are ready to proceed by argument but.

J365jar2

1          MR. MARCUS AMELKIN:  I haven't had a chance to put on

2     a case.

3          MR. NESSIM:  Sorry.

4          MR. MARCUS AMELKIN:  We don't intend to call any

5     witnesses, your Honor.  We would like the opportunity to brief,

6     maybe with simultaneous briefings, for post-hearing argument.

7          THE COURT:  Okay.

8          MR. MARCUS AMELKIN:  I would suggest a short runway,

9     maybe two weeks.

10         THE COURT:  All right.

11         MR. MARCUS AMELKIN:  I would also like a moment to

12    talk to the government about a couple pieces of evidence that

13    were not admitted that we would like to probably submit for

14    your review.

15         THE COURT:  What are they?

16         MR. MARCUS AMELKIN:  I don't think there should be any

17    issue on these.  One is Officer Maria's memo book that was used

18    extensively during questioning, I don't think we admitted it.

19         THE COURT:  Mr. Nessim?

20         MR. NESSIM:  It's fine, your Honor.  We have no

21    objection.

22         THE COURT:  Okay.  So, it is received in evidence.

23         (Defendant's Exhibit C received in evidence)

24         MR. MARCUS AMELKIN:  The second is the Brady

25    disclosure government provided to us.  We would like to rely on

J365jar2

1   it for argument but we didn't question officer about during the

2   hearing.

3          THE COURT:  Okay.  What is the Brady material?

4          MR. MARCUS AMELKIN:  That two of the officers on the

5   team apparently recently conducted a similar stop and lied

6   about it and they no prossed the case.

7          THE COURT:  Okay.  Not Cassase or Maria?

8          MR. MARCUS AMELKIN:  It is my understanding Cassase

9   logged the arrest but wasn't present for it.

10          THE COURT:  Yes.

11          MR. MARCUS AMELKIN:  But the other two officers in the

12   car are the officers at issue --

13          THE COURT:  Okay.

14          MR. MARCUS AMELKIN:  -- including their sergeant.

15          THE COURT:  All right.

16          MR. MARCUS-AMELKIN:  And then the third is we are

17   going to get Mr. Jarvis' clothes, which we believe are in

18   property at Rikers Island.  We would like the Court to look at

19   the Nike Pro pants.

20          THE COURT:  Okay.

21          MR. MARCUS AMELKIN:  And we are going to make sure we

22   get those quick.

23          THE COURT:  Now, today is the 6th of March.  When do

24   you want to brief the -- I like your suggestion,

25   Mr. Marcus Amelkin, about simultaneous briefing.  When do you

J365jar2

1    want to do it?

2              MR. MARCUS AMELKIN:  How about by the 15th, if that's

3    good with the government -- sorry, by the 22nd, if that's good

4    with the government.

5              THE COURT:  Mr. Nessim?

6              MR. NESSIM:  That's fine, your Honor.

7              THE COURT:  Both briefs by the 22nd.  I will give you

8    one week to reply to the briefs and that will be by the 29th.

9              MR. NESSIM:  Thank you, your Honor.

10             Just a note on the Brady disclosure that defense

11   counsel mentioned?

12             THE COURT:  Yes.

13             MR. NESSIM:  We certainly think that the Court can

14   consider it and it can form the basis of arguments.  Whether it

15   is formal exhibit as part of the court record, I think we have

16   concerns.  I think there are ongoing actions taking place as a

17   result of referrals that were made pursuant to the events in

18   question so it may be a distinction without a difference but we

19   ask that it be sealed if it is in the record as a formal

20   exhibit.

21             THE COURT:  I think you can work that out with

22   Mr. Marcus Amelkin and if you can't, bring it to my attention

23   and I will resolve it for you.

24             MR. NESSIM:  Thank you, your Honor.

25             THE COURT:  Okay.

J365jar2

1             MS. SHROFF:  Your Honor, are we adjourned?

2             THE COURT:  You are adjourned, yes.

3             MS. SHROFF:  Thank you.

4             THE COURT:  Thank you Mr. Jarvis.

5             THE DEFENDANT:  Thank you, your Honor.  Have a good

6    day.

7             THE COURT:  Same to you.

8                              o0o

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2     Examination of:                            Page

 3     ANTHONY CASSASE

 4     Direct By Mr. Nessim . . . . . . . . . . . . . 4

 5     Cross By Mr. Marcus Amelkin  . . . . . . . . .26

 6     Redirect By Mr. Nessim . . . . . . . . . . . .56

 7     Recross By Mr. Marcus Amelkin  . . . . . . . .66

 8     DANIEL MARIA

 9     Direct By Mr. Nessim . . . . . . . . . . . . .69

10     Cross By Ms. Shroff  . . . . . . . . . . . . .84

11     Redirect By Mr. Nessim . . . . . . . . . . . 140

12     Recross By Ms. Shroff  . . . . . . . . . . . 147

13                        GOVERNMENT EXHIBITS

14     Exhibit No.                            Received

15      1   . . . . . . . . . . . . . . . . . . . . 8

16      2   . . . . . . . . . . . . . . . . . . . .11

17      3A, 4A, and 5A . . . . . . . . . . . . . . .17

18                        DEFENDANT EXHIBITS

19     Exhibit No.                            Received

20      A   . . . . . . . . . . . . . . . . . . . .36

21      C   . . . . . . . . . . . . . . . . . . . 152

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300