USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/30/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

UNITED STATES OF AMERICA,

  -*against*-

ROLAND JARVIS,

                *Defendant.*

----------------------------------------------------------X

18 Cr. 475 (PAC)

**ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

    Defendant Roland Jarvis was arrested on May 4, 2018 at 1:30 a.m. at the intersection of Woodycrest Avenue and West 166th Street in the 44th Precinct, Bronx, New York. At the time of the arrest the police seized a Glock semi-automatic pistol. On July 9, 2018, a Grand Jury indicted Jarvis as a felon in possession of a firearm, in violation of 18 U.S.C. 922(g)(1)-(2). Jarvis now moves to suppress the gun for lack of probable cause to arrest him, and if the police were conducting an investigatory stop which led to the arrest the officers lacked reasonable suspicion.

    The entire incident from beginning to end took less than a minute. Two NYPD officers testified about the arrest. A number of exhibits were recorded in evidence, including two video surveillance tapes which show the street scape at the time, date, and place of the arrest. A police body camera was activated and recorded a portion of the struggle between the police and Jarvis during the arrest. Mr. Jarvis did not testify.

    The Government has failed to satisfy its burden to show that there was probable cause to arrest Jarvis or reasonable suspicion to stop him. For the reasons that follow, the Court finds that the search of Jarvis violated the Fourth Amendment and GRANTS Jarvis' motion to suppress.

## **LEGAL STANDARDS**

"The Fourth Amendment protects persons against unreasonable searches and seizures. Evidence seized pursuant to an unreasonable search or seizure or evidence that is the fruit of an unreasonable search or seizure must be suppressed and cannot be used in the prosecution's case in chief." *United States v. McCargo*, 464 F.3d 192, 196 (2d Cir. 2006) (internal quotations and citations omitted). If a defendant establishes a basis for a suppression motion, the Government "carries the burden to demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment." *United States v. Strachon*, 354 F.Supp.3d 476, 483 (S.D.N.Y. 2018).

Warrantless searches and seizures are presumptively unreasonable, but there are exceptions to the warrant requirement. *McCargo*, 464 F.3d at 196. One exception is if a search is incident to a valid arrest supported by probable cause. *United States v. Nelson*, No. 10 CR. 414 PKC, 2011 WL 1327332, at *3 (S.D.N.Y. Mar. 31, 2011), *aff'd*, 500 F. App'x 90 (2d Cir. 2012). "[P]robable cause to arrest exists when police officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007) (internal citation and quotation marks omitted).

Even if there is no probable cause to arrest, an officer may conduct a "*Terry* stop" and "briefly detain an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity." *United States v. Padilla*, 548 F.3d 179, 186 (2d Cir. 2008); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968). During a *Terry* stop, officers are permitted to perform a limited pat-down search if they have reasonable grounds

to believe the person stopped may be armed and dangerous, and the search was necessary for the protection of themselves and others. *See Terry*, 392 U.S. at 29.

A *Terry* stop can ripen into a *de facto* arrest that must be supported by probable cause. *See United States v. Glover*, 957 F.2d 1004, 1011 (2d Cir. 1992). The Second Circuit uses a two-step objective test to determine whether a person was under arrest, which asks whether: (1) "a reasonable person in the defendant's position would have understood that he or she was free to leave"; and (2) "there was a restraint of freedom of movement akin to that associated with a formal arrest." *United States v. Santillan*, 902 F.3d 49, 60 (2d Cir. 2018).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

### I. Officer Cassase's Attention is Drawn to Jarvis

On May 4, 2018, around 1:00 a.m., four plainclothed police officers with the NYPD—Anthony Cassase, Daniel Maria, Robert Cabrera, and Christopher Crain—were patrolling in the Bronx in an unmarked vehicle. (Dkt. 17 ("Tr.") 5:24-6:24; 71:5-12.) The car rolled up about ten feet away from a group of people standing on the sidewalk on the east side of Woodycrest Avenue, at the corner of West 166th Street. (*See id.* 17:11-18:3; 67:25-68:4; GX 5-A.[2]) According to Officers Cassase and Maria, the area around Woodycrest Avenue and West 166th Street is considered to be a high crime area. (Tr. 8:23-9:1; 72:19-73:2.) The officers had not been dispatched to investigate a crime or a complaint, (*id.* 32:19-25), but stopped because they

---

[1] At a March 6, 2019 suppression hearing, the Government called two witnesses: New York City Police Department ("NYPD") Officer Anthony Cassase and Officer Daniel Maria. The findings of fact and conclusions of law are based on the Court's assessment of the witnesses' credibility, surveillance video footage, and the other admitted evidence.

[2] The Government's exhibits are indicated by a "GX" prefix. GX 5-A is video footage from a building on Woodycrest Avenue, which captures the events at issue on the morning of May 4, 2018. There was no police body camera video footage captured until after Jarvis was tackled, as none of the four police officers turned on their body cameras until that point. (*See* Ex. GX 3-A; Tr. 24:7-9; 55:17-20; 78:21-79:5.)

3

thought some members of the group were drinking and smoking marijuana, (*id.* 7:6-13; 11:20-25; 38:1-7; 72:2-7).

When the unmarked car pulled up on Woodycrest, Officer Cassase testified that he "noticed the defendant start walking off. That's what drew my attention to him initially." (*Id.* 11:24-12:1.) "I saw the defendant start walking off, he had like a nervous, like -- like seen-a-ghost type face." (*Id.* 12:16-18.) Cassase did not conclude that Jarvis had committed a crime, such as drinking in public or smoking marijuana. (*Id.* 43:1-6.) While Cassase claimed that Jarvis adjusted his waistband, Cassase focused on the fact that Jarvis seemed intent on walking away from him. First, as he traveled south on Woodycrest, and then later reversing course and walking north on Woodycrest. (*Id.* 12:18-24.) Seconds later as Jarvis darted between parked vehicles, Cassase pulled Jarvis by the hair and tackled him from behind. (*Id.* 15:14-19.)

With regard to Cassase's testimony concerning the waistband adjustment, it is difficult to credit. The video shows that as the unmarked patrol car pulled up to the scene, it stopped alongside a parked vehicle. (*See* GX 5-A.) It would not have been possible for Cassasse to have seen anyone adjusting a waistband because his view from the back seat of the car (he could not remember whether was on the passenger side or the driver side, (Tr. 31:4-10, 61:24-26)) was obstructed by the parked vehicle. Moreover, the way the cars were parked as seen on the video, it would not have been possible for Cassase to have seen Jarvis "in between the cars," (*id.* 61:19-25), as he testified. Furthermore, Jarvis is seen on the video walking away from the parked vehicle, with his back to the street—and to Officer Cassase's view. Also if Cassase really thought the waistband adjustment revealed that Jarvis was armed, he should have called out "gun" to alert his co-officers to the dangerous situation. (*Id.* 151:11-18). At most, the circumstances led Officer Cassase to develop a hunch that Jarvis had a gun. But while "get a

4

hunch, bet a bunch" may work at the racetrack, it does not provide a justification for what the officers did. The Fourth Amendment requires reasonable suspicion at minimum to stop someone on the street. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002); *Strachon*, 354 F.Supp.3d at 488 ("The Fourth Amendment cannot countenance unsupported hunches by our police, no matter how well intentioned their actions are.").

## II. Jarvis Walks Away From Officer Cassase

As Jarvis was walking south on the sidewalk, Officer Cassase exited the vehicle and said "Police. Hold up." (Tr. 12:19-20.) Jarvis continued walking south on the sidewalk, and Cassase followed him in the street. (*Id.* 12:20-22.) Jarvis then turned around and started walking northbound, and Cassase followed him on the sidewalk, asking him to "hold up" again. (*Id.* 12:22-25; 15:7-10.) Jarvis responded to Cassase, "For what?," and then sped up and darted between two parked cars. (*Id.* 15:7-16.) The Government argues that these movements were evasive and contributed to Officer Cassase's reasonable suspicion that Jarvis had a gun. But "[s]imply beginning to walk, absent additional indicia of evasion, is not closely correlated with criminality." *United States v. McCrae*, No. 07-CR-772JG, 2008 WL 115383, at *3 (E.D.N.Y. Jan. 11, 2008). The Court is not obliged to defer to the Government's description of Jarvis' movements as "furtive" or "evasive," *see id.* at *3 n.5, particularly where, as here, Jarvis has a reasonable explanation that he was walking away because he thought the police were clearing the street, *see United States v. Doughty*, No. 08 CR. 375 (RPP), 2008 WL 4308123, at *6 (S.D.N.Y. Sept. 19, 2008) ("[T]here are a myriad of innocent explanations for Defendant's conduct."). As the Second Circuit has explained, if we accept the Government's argument that a "simple refusal to comply could create reasonable suspicion where none existed before, we would create a truly paradoxical class of individuals: individuals who cannot be stopped by officers, but who can be

5

stopped if they refuse to stop," which would "gut the Court's repeated determination that an individual approached by the police 'need not answer any question put to him.'" *United States v. Freeman*, 735 F.3d 92, 101 (2d Cir. 2013).

Officer Cassase also claimed that he saw Jarvis adjusting his waistband a second time when Jarvis turned to walk northbound, (Tr. 62:3-7), but later contradicted himself by stating that Jarvis grabbed the gun for the second time when Cassase started running after him—*i.e.* one or two seconds before he grabbed his hair and tackled Jarvis from behind. (*Id.* 68:10-17.) Still, Cassase ceded that he never saw a bulge in Jarvis's pants; or the butt of a gun sticking out of Jarvis's waistband. (*Id.* 44:23-45:8.) Even if Jarvis adjusted his waistband once or twice, the Government still has failed to meet its burden to show that there was probable cause or reasonable suspicion. *See, e.g., United States v. Doughty*, 2008 WL 4308123, at *6 (S.D.N.Y. Sept. 19, 2008) (no reasonable suspicion where defendant was on the street at 10:00 pm in a high crime area, exhibited suspicious demeanor, and adjusted his waistband); *United States v. McCrae*, No. 07-CR-772JG, 2008 WL 115383, at *3 (E.D.N.Y. Jan. 11, 2008) (defendant's presence in a high crime area and "evasive" movements to walk away from officers do not rise to reasonable suspicion, even if he adjusted his waistband); *People v. Carmichael*, 92 A.D.3d 687, 688 (N.Y. App. Div. 2012) ("Under the circumstances of this case, the 'tens[ing]' of the defendant's arm 'around the vicinity' of his waistband, even coupled with his flight from the officers, did not constitute specific circumstances indicative of criminal activity so as to establish the reasonable suspicion that was necessary to lawfully pursue the defendant").

Taking into account Officer Cassase's experiences and training as an officer, there was no particularized and objective basis for suspecting that Jarvis had committed a crime under these circumstances. *See Arvizu*, 534 U.S. at 273; *United States v. Bailey*, 743 F.3d 322, 332 (2d

Cir. 2014). Jarvis' behavior is entirely consistent with the innocent explanation that he was walking away from an encounter near where he lived because he believed the officers were clearing the street, as they commonly do. (*See* Tr. 42:12-15; 62:22-25.) While innocuous facts may, in the totality of the circumstances, give rise to reasonable suspicion, *see Padilla*, 548 F.3d at 187-89, the facts here do not. This is especially true given that neither Officer Cassase nor Officer Maria believed Jarvis was committing the crime that initially drew their attention to the group—drinking and smoking marijuana in public. *Cf. United States v. Singletary*, 798 F.3d 55, *62 n.6 (2d Cir. 2015) (reasonable suspicion where defendant "was himself seen cautiously carrying a beer-sized can wrapped in brown paper"); *United States v. Brown*, No. 07-CV-232 (JBW), 2007 WL 2121883, at *1 (E.D.N.Y. July 25, 2007) (reasonable suspicion where officers observed the defendant openly drinking a beer in public and putting the bottle down before trying to walk away).

### III. Jarvis is Arrested

Jarvis ran only a few steps before Officer Cassase grabbed him by the hair and tackled him from behind in the street. (Tr. 15:12-19; 52:3-5.) This was an arrest; he certainly was not free to leave. Jarvis landed on his face with his arms beneath his body, (*id.* 15:12-21; 52:8-14), the other officers converged on him, (*id.* 16:6-9), and his movement was completely restrained, *see United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) ("In determining whether an investigatory stop is sufficiently intrusive to ripen into a *de facto* arrest, the Second Circuit considers the amount of force used by the police, the need for such force, and the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not

7

handcuffs were used."). Indeed, Officers Cassase and Maria testified that Jarvis was not free to leave, (Tr. 52:25-53:4; 132:19-20; 150:24-151:2), and Officer Cassase also stated that Jarvis was under arrest once he was tackled. (*Id.* 52:25-53:6.)[3]

Not only did Officer Cassase not have reasonable suspicion to stop Jarvis prior to tackling him, he did not have probable cause to arrest him when he tackled him. Jarvis had done nothing wrong in walking away from the police, and nothing about the encounter provided Office Cassase with knowledge "to warrant a person of reasonable caution in the belief that" Jarvis had committed or was committing a crime. *Walczyk*, 496 F.3d at 156.

### IV. Jarvis is Searched

Officer Cassase testified that, after tackling Jarvis, he tried to pull Jarvis's arm out from under him because it seemed like his hand was on a gun, but that Jarvis resisted. (Tr. 15:20-16:5.) Officer Maria reached underneath Jarvis and recovered a Glock semi-automatic pistol from Jarvis. (*Id.* 16:6-11; 76:6-12; 77:17-18.)

Since Jarvis had already been arrested without probable cause before being searched, there was no basis to search him. The Government's assertion that this was a *Terry* stop until handcuffs were placed on Jarvis is rejected. Jarvis was clearly not free to leave when he was tackled facedown on the pavement and surrounded by four officers—a fact that even the Government's witnesses recognized.

---

[3] The follow-up question asked whether Officer Cassase tackled Jarvis "with the intention of arresting him." (Tr. 53:7-8.) Officer Cassase responded: "Well, to stop him." (*Id.* 53:9.)

8

## CONCLUSION

The Government has not met its burden to demonstrate by a preponderance of the evidence that the search and seizure of Jarvis did not violate the Fourth Amendment. *Strachon*, 354 F.Supp. 3d at 483. The police did not have probable cause to arrest or reasonable suspicion to stop Jarvis. The resulting search, which recovered a handgun, was illegal. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

The Defendant's motion to suppress physical evidence is GRANTED. The Clerk of Court is directed to close the entry at Dkt. 8.

Dated: New York, New York
April 30, 2019

SO ORDERED

/s/ Paul Crotty
PAUL A. CROTTY
United States District Judge